**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
(Harrisonburg Division)

|  |  |  |
|---|---|---|
| **JACQUALINE SAVILLE,** <br> 63 Bellwood Road, <br> Capon Bridge, WV 26711 <br><br> Plaintiff, <br><br> v. <br><br> **NORTHWESTERN REGIONAL ADULT DEFENTION CENTER.** <br> 141 Fort Collier Road <br> Winchester, VA 22603 <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Civil Action No.** 5:22-cv-00057 |

**COMPLAINT**

**INTRODUCTION**

1.  This action is brought by Jacqualine Saville ("Plaintiff" or "Saville"), a correctional officer, for declaratory, injunctive, and monetary relief against her employer, Defendant Northwestern Regional Adult Detention Center, ("Defendant" or "NRADC") for paying her less than her male comparators, for disparately disciplining her on the basis of her sex, and for retaliating against her for her protected activity.

**JURISDICTION AND VENUE**

2.  This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* ("Title VII") including, but not limited to the Lily Lilly Ledbetter Fair Pay Act of 2009; the Equal Pay Act of 1963, 29 U.S.C. § 206 *et seq.* ("EPA"); and the Virginia Human Rights Act ("VHRA"), Va. Code § 2.2-3900 *et seq.*

1

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action raises allegations under federal laws.

4. This Court has supplemental subject matter jurisdiction over Saville's VHRA claim pursuant to 28 U.S.C. § 1367, as it arises from a common nucleus of facts as her federal law claims.

5. Venue is proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this Complaint took place in Winchester, Virginia, where NRADC is located and where Saville works.

6. At all times relevant to this complaint, Defendant was Plaintiff's employer under the EPA, Title VII, and the VHRA.

7. In consideration of the foregoing, personal jurisdiction and venue are proper in this Court.

## PARTIES

8. Plaintiff began working for NRADC on or about July 8, 2008, as a correctional officer and at all times relevant to this complaint has held the title of Lieutenant. Plaintiff has worked in the field of corrections for over 19 years.

9. Defendant is a detention facility located in Winchester, Virginia.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. On or about July 30, 2021, Plaintiff filed a complaint with the Office of the Attorney General of Virginia, Office of Civil Rights ("OCR"). On or about August 1, 2021, Plaintiff cross-filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Her charge was filed within 180 days after one or more of the alleged unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964 had occurred.

11. On or about August 17, 2021, the OCR transferred Plaintiff's complaint over to the EEOC. Plaintiff amended her EEOC charge on September 15, 2021, to include her pay discrimination

claim and additional incidents of retaliation.

12. On July 6, 2022, Plaintiff received a Notice of Right to Sue from the EEOC. This notice gave Plaintiff 90 days from the receipt of the notice to file her Complaint related to her Title VII claims, which is on or before October 4, 2022.

13. Plaintiff has exhausted all administrative remedies and has timely filed this instant Complaint.

## FACTS

**NRADC Disparately Disciplined Saville Despite Her Exemplary Work Performance**

14. Saville is an exemplary employee of 14 years who has exceptional performance reviews and whose work colleagues and supervisors know as a "rule follower", and has over 19 years of correctional experience. She received 3.9 and 3.6 out of 4 on her 2018 and 2019 annual performance reviews and received a 3.9 out of 4 on her 2020 annual performance review.

15. In Saville's 2020 performance review, she received the second highest rating of "**Above Expectations**" for the categories of the Job Knowledge, Work Quality, Work Quantity, Communication Skills, Work Habits, Problem Solving Skills, Appearance, and Safety categories.

16. Saville's 2020 performance review defined Job Knowledge as "[a]pplies technical/administrative knowledge within area of expertise; maintains awareness of field; exhibits initiative to expand job knowledge." Communication Skills was defined as "[c]ommunicates effectively both orally and in writing; prepare clear, concise correspondence and related documentation; exhibits good listening skills", and Safety was defined as "[e]xecutes good safety habits. Cares for and maintains appropriate equipment to perform duties."

17. Saville also received the rating of "**Meets Expectations**" for the Interpersonal Relations category, which showed that she sufficiently met NRADC's expectations for that category by "Contribut[ing] to the achievement of county objectives by effectively working with others,

3

making appropriate adjustments as needed."

18. Despite her proven track record of exemplary job performance, Saville faced disparate discipline as a female officer from NRADC in September 2020.

19. On September 21, 2020, Saville had a 75-second verbal disagreement with her subordinate, Officer Cody Landis ("Landis") (herein referred to as "the incident"), regarding housing an inmate who was cleared from Suicide Observation only twenty minutes prior to Landis' disagreement with Saville.

20. Jail staff attempted to place the inmate in a joint cell with another inmate, but he refused that housing. As a result, Saville escorted the inmate to booking so he could have a temporary cell placement while the jail found him an appropriate cell. When Saville got to the booking area, she told Sergeant Jason Mowery ("Mowery") that the inmate needed to be housed in booking because he was refusing to be housed with another inmate.

21. Landis inappropriately interjected himself into the conversation between Saville and Mowery and loudly told Saville that Kevan Frye ("Frye") said that the inmate could have a single cell.

22. Landis only had five years of experience as a correctional officer whereas Saville had seventeen years of experience as a correctional officer at that time.

23. Given her position and rank as the Lieutenant of Classification and Security, Saville had the discretion to determine whether the inmate was ultimately placed in a single cell or joint cell as she was responsible for the safety and security of all inmates and staff, and the housing of all inmates.

24. Because Frye had just cleared the inmate from suicide watch, Saville believed that it was safer for him to be in a joint cell and was following NRADC's Standard Operating Procedure # 13.04 on Suicide Prevention, which stated that "inmates being reclassified from suicide watch will not be assigned to a single cell for at least 15 days following the reclassification."

25. Saville repeated her request to Mowery for a cell to temporarily place the inmate in. Landis loudly challenged Saville for a second time, telling her that the inmate should have a single cell. He undermined Saville's authority in front of the inmate and the other jail staff, which put her in a dangerous position. This was a classic case of insubordination and open disrespect.

26. Saville told Landis not to undermine her authority in front of an inmate. In response, Landis escalated the situation and started yelling and cursing at her. Saville was not expecting that response and left the area to de-escalate the situation and report the incident.

27. On September 25, 2020, Saville's direct supervisor, Captain Heath Custer ("Custer") informed Saville that he was recommending a Level-1 Reprimand for her conduct. Saville asked Custer if a Level-1 Reprimand was a fair disciplinary measure, especially when NRADC did not discipline Landis or other male employees for the same or more severe behavior.

28. After Saville expressed her concerns over the disparate discipline, Custer said, "*Saville, you do not want to be one of those people, you know how those people are treated*." Saville proceeded to tell Custer that NRADC was treating her unfairly and discriminating against her as a female corrections officer because the jail was only disciplining her and not Office Landis.

29. Nevertheless, on October 5, 2020, NRADC gave Saville a Level-1 Reprimand with one day of suspension without pay. In contrast, NRADC did not discipline Landis despite his insubordination and escalation, which violated NRADC policy.

30. As a 12-year exemplary employee, Saville had no prior discipline up until that point, so the punishment was disproportionate for the alleged offense, especially in light of the fact that Landis received no punishment for cursing at Saville and being insubordinate to her.

**Saville Appealed NRADC's Disparate Discipline**

31. The Level-1 Reprimand with one day of suspension did not follow the Frederick County Policy of Progressive Discipline as this was the first discipline Saville had ever received in her over 12

years of employment with NRADC.

32. Under the disciplinary policy, Saville should have only received a write up. Saville requested that NRADC change the disciplinary measure to a written counseling in accordance with the jail's policy. NRADC refused to do so.

33. On October 7, 2020, Saville appealed the reprimand to the superintendent through the grievance process noting the discrepancies in the original discipline that Custer issued because the witnesses he spoke with had materially different accounts of the incident.

34. After Saville raised these discrepancies, Superintendent Jim Whitely ("Whitely") ordered an internal affairs ("IA") investigation. He made it clear at Saville's grievance hearing that he did not take kindly to her appealing the original discipline and testified that he was surprised that she appealed the Level-1 Reprimand.

35. Notably, Whitely did not have Kim Benson ("Benson"), conduct the investigation even though she was the designated facility investigator who regularly conducted IA investigations and was available to do so in Saville's case.

36. Instead, Whitely deviated from procedure and ordered a male employee, Captain Shawn McQuaid ("McQuaid"), to conduct the investigation, most likely because he felt that Benson, as a female, would not be able to fulfill her professional duties in investigating a case involving another female officer.

**NRADC Intentionally Disclosed Saville's IA Investigation to the Entire Jail in Violation of Its Own Standards of Procedure**

37. After placing Saville on administrative leave on October 23, 2020, Custer sent out an email to all supervisors, officers, and the entire jail staff to inform *everyone* that NRADC had placed Saville on administrative leave pending the outcome of the IA investigation.

38. NRADC had never before sent out an email like that, which embarrassed Saville and damaged

6

her reputation with NRADC staff, not to mention her peers.

39. Custer's email violated Northwestern Regional Jail General Order #3 on Internal Affairs Investigation, which states, "No information regarding an Internal Affairs investigation shall be released to any party without the express approval of the Superintendent. The prohibition includes release of information concerning the parties involved and the events."

40. Captain Lisa Saville ("Captain Saville"), a retired 28-year employee, testified during a later grievance hearing that in all her years working for NRADC, she had never seen the jail send out an email like the one concerning Saville's IA investigation.

**NRADC Conducted a Biased Investigation Against Saville and Terminated Her for Pretextual Reasons**

41. During the IA investigation, NRADC gave every witness the opportunity to write an additional statement, *except for* Saville. Many of the additional statements from the witnesses differed greatly from their original statements, which gave the appearance that they were coached as to what to write to make Saville look bad, and some witnesses changed their statements. Some said that Saville was cursing, while other witnesses did not. For the aforementioned reasons, these statements NRADC used to discipline her appear to be unreliable as a basis for their decision to terminate her.

42. After McQuaid concluded the IA investigation, NRADC wrongfully terminated Saville on November 2, 2020, citing three pretextual reasons: First, NRADC stated that it terminated Saville because she disregarded the inmate's safety by not placing him in a single cell even though she was following NRADC's Standard Operating Procedure on Suicide Prevention, See ¶ 24; Second, NRADC stated that it terminated Saville because she cursed at Landis even though witness testimony from Mowery revealed that Landis cursed at her, as well, but NRADC did not terminate him or discipline him at all; and Third, NRADC said it terminated Saville

7

because she was untruthful during the investigation and lied about her awareness of whether there was a single cell available for the inmate. Saville did not lie during the IA investigation and was unaware of a single cell being available to the inmate at that time. Even if there was a single cell available for the inmate, NRADC's policy at that time prevented staff from placing inmates in single cells if they had recently been on suicide watch like the inmate in question. See ₱ 24.

43. After NRADC wrongfully terminated Saville, the jail replaced her with a male lieutenant, Lieutenant Denzel Cooper.

44. Saville appealed the termination to the Human Resources ("HR") Director, the County Administrator, and ultimately to a Step IV Grievance Panel per the Frederick County Grievance Policy and Procedure.

**The Step IV Grievance Panel Unanimously Reversed Saville's Termination and Ordered that She Should be Reinstated with Full Back Pay**

45. The County Administrator, Kris Tiernay ("Tiernay") was involved in the grievance process and was supposed to be an impartial party but was not.

46. On January 26, 2021, Tiernay testified during the Step IV Grievance Panel ("Panel") hearing on Saville's appeal that he upheld the decision to terminate Saville only because he "did not want to go against the decision of Whitely." He also testified that Whitely first met with his command staff comprised of Clay Corbin, Patty Barr, Heath Custer, and Shawn McQuaid, at the jail to determine whether *they wanted* Saville to return to work even though it was "Tiernay's decision". In giving Whitely such deference, Tiernay violated Frederick County policy and was not an impartial party.

47. After reviewing all the evidence and hearing witness testimony, the Panel reversed Ms. Saville's termination, holding that "we could not support the termination **of an exemplary employee of**

8

**12 years who had exceptional performance reviews up until this time**.” (emphasis added).

48. Accordingly, NRADC reinstated Saville to her lieutenant position with full back pay.

49. During the hearing, the Panel also heard from witnesses such as Mowery, Frye, and Captain Lisa Saville, whose testimonies highlighted NRADC's discriminatory animus against Saville as a female corrections officer because of the disparate disciplined she faced.

50. Mowery corroborated Saville's testimony that Landis undermined her authority and publicly cursed at her during the disagreement on September 21, 2020, and that he was not punished at all.

51. Frye testified that the inmate Saville had escorted to booking was manipulative and had been on suicide watch multiple times. Frye knew the inmate had hit his head against the wall in the past to injure himself. It was well known that the inmate was a danger to himself, and thus should not have been housed in a single cell as the inexperienced Landis had suggested.

**The Panel Denied NRADC's Improper Request to Reconsider Its Binding Decision Reversing Saville's Wrongful Termination**

52. On February 4, 2021, counsel for NRADC requested that the Panel reconsider its decision and include additional language in its decision stating that Saville violated NRADC's code of ethics and that the Panel supported a demotion instead of a termination.

53. This was an improper request and evidenced NRADC's retaliatory motive because Saville did not ask the Panel to consider whether a demotion or any other type of discipline was appropriate. The Panel was only tasked with deciding whether to uphold NRADC's decision to terminate Saville.

54. On February 5, 2021, counsel for Saville asked the Panel to stand firm in its decision and highlighted the evidence that led to its decision and the disparate discipline Saville experienced compared to her male comparators:

"[N]one of the NRADC's three pretextual reasons for wrongfully terminating Saville panned out at the Step IV panel hearing for the reasons outlined in my written closing statement dated January 29, 2021. Namely, Saville did not disregard Inmate Daugherty's safety by refusing to put him in a single cell pursuant to NRADC's policy on Suicide Prevention, she did not lie during the investigation (or anytime thereafter) about her lack of awareness of there being a single cell available for inmate Daugherty, and lastly, it is a *stretch of the imagination* that NRADC fired Saville for having a 75 second verbal disagreement with a subordinate, Mr. Landis, where she counseled him not to ever undermine her in front of an inmate, especially in light of the fact that Saville was a 12 year employee with no prior written discipline who received 3.9 and 3.7 out of 4 on her last two performance reviews.

Testimony at the Step IV Panel hearing on January 26, 2021 documented that Mr. Landis's own boss, Sergeant Jason Mowery recalled him cussing at Saville and had a brief conversation with him but besides that Mr. Landis was not disciplined at all. No written reprimand, no proposed suspension. No proposed demotion. No time off without pay. Not even an investigation into his role in the 75 second verbal disagreement. Mr. Landis got off scot-free. This was starkly different from how NRADC treated Saville. The history of disparate discipline is in line with the evidence presented of other NRADC male employees' more egregious incidents who continue to be employed at NRADC, some of which were not subjected to discipline."

55. The Panel rightfully denied NRADC's request to reconsider its ruling and did not include the additional retaliatory language that NRADC requested to be added. The Panel affirmed its ruling that NRADC should not have terminated Saville.

**NRADC Has a Pattern and Practice of More Harshly Disciplining Female Employees**

56. NRADC has failed to impose the same level of discipline on male employees who engage in egregious, reckless, and negligent behavior, as it did on Saville for a mere 75-second disagreement when she had no prior discipline and had stellar performance reviews.

57. Historically, male employees either receive minimal disciplinary action for their egregious behavior or *none whatsoever.*

58. NRADC only gave a verbal counseling to a male lieutenant that called a nurse a "stupid fucking bitch" in front of a room full of mostly male jail staff. Saville on the other hand received a Level-1 Reprimand and was then terminated for cursing after appealing her discipline.

59. NRADC did not take any disciplinary action against a male sergeant who misfired a taser while

he was "showing off" in the medical department for his girlfriend, even though his reckless and dangerous behavior could have harmed someone.

60. NRADC did not take any disciplinary action against two male sergeants for losing a case full of firearms, despite their negligence and reckless disregard for the safety of the community. These two male sergeants, who were trained Firearm Instructors, placed a case of firearms on the back of a pick-up truck and left the tailgate open, which dangerous. The firearms slide off the truck and landed in the middle of the road and were found by a civilian.

61. NRADC only placed a male officer on temporary administrative leave when he used excessive force in two separate instances within 30 minutes of each other and gave him a Level-1 Disciplinary Action. NRADC did not terminate the officer, nor did it send an email to the entire jail staff about placing the officer on administrative leave like it did for Saville.

62. NRADC's pattern of discriminating against female employees is well known among the local community. On March 1, 2022, a local newspaper, the Winchester Star, published an article, titled "Jail Chief Disputes Whistleblower Complaints," which uncovered the abusive and unwelcoming work environment NRADC created for female employees.

63. A female corrections officer contacted the Winchester Star regarding the abusive work environment at NRADC. The female employee told the newspaper that "staff was regularly subjected to profanity and 'crude sexual humor and constant degradation' by fellow employees" and that "[t]he lack of competent supervision has led to this toxic culture. Inmates saying these things are one thing and is part of the job. Staff and supervisors should be held to a higher standard."

64. The female employee also told the newspaper that "a network of 'good old boys' at the jail ensures their friends are promoted over more qualified staff," and that "officers are subjected to forced overtime due to understaffing and aren't compensated for being on call for eight hours on

11

designated days."

**NRADC Pays Saville Less than Her Male Comparators**

65. Saville is the only female lieutenant at NRADC and has served as a lieutenant for six of the 14 years she worked for the jail. In total, she has 19 years of correctional experience, and is an excellent and hard-working employee, as documented in performance reviews. See ¶¶ 14-17.

66. In June 2021, despite her long tenure and level of experience, Saville only found out that she was *the lowest paid* lieutenant after having a conversation with Custer.

67. Custer and Saville were having a casual discussion when he suddenly brought up Saville's salary. Custer told Saville that he recently had a conversation with the male lieutenants about their range of pay and found out that she was paid the lowest out of the other seven male lieutenants, Wade Taylor, Larry Mackey, John Derito, Robert Shank, Mike Parker, Daniel Cottrill, and Denzel Cooper.

68. Custer claimed that he was not aware that Saville had the lowest salary until then, however, he did not take any corrective action to raise Saville's salary, which bothered Saville.

69. Saville has been a lieutenant longer than five of her male counterparts, Taylor, Mackey, Derito, Shank, and Parker, and she came into her job at NRADC with extensive work experience in corrections.

70. NRADC has no legitimate basis to pay Saville the lowest salary when she has had a longer tenure as a lieutenant than the majority of her male comparators, has more correctional experience, and performs equal work.

71. To date, NRADC has refused to pay Saville a salary comparable to her male counterparts, which is unlawful and discriminatory.

**NRADC Retaliated Against Saville After She Engaged in Protected Activity**

72. On September 25, 2020, Saville engaged in protected activity when she told Custer that she was

being treated unfairly as a female corrections officer because NRADC only disciplined Saville and not Landis.

73. On October 7, 2020, Saville engaged in protected activity when she appealed her Level-1 Reprimand and suspension without pay due to the disparate discipline between herself and Landis. NRADC terminated Saville a month later for three pretextual reasons that were proved false at the Step IV Panel hearing. See ‖ 47.

74. Saville continued to engage in protected activity throughout the appeals process and through the Panel hearing, because she was opposing NRADC's sex discrimination against female corrections employees.

75. On March 1, 2021, Saville returned to work after NRADC reinstated her and found out that the jail had replaced her with a male lieutenant, Denzel Cooper. See, ‖ 43. That same day, Superintendent Clay Corbin ("Corbin") met with Saville and told her, *"[T]he one thing I really didn't like was how your attorney kept making comments about the jail discriminating against females*." Corbin's inappropriate comment made Saville uncomfortable because he implied that Saville had done something wrong by raising her genuine concerns about sex discrimination with the Panel. Additionally, upon Saville's return to work, Corbin tried to place her in a different position rather than reinstating her to her original position of Lieutenant of Classification and Security like the Panel ordered NRADC to do. Saville told Corbin that she still had another year left as Lieutenant of Classification and Security and wanted to fulfill her time commitment of three years for the specialty position, which he reluctantly allowed her to do.

76. Corbin proceeded to ask Saville if she really felt that the jail was discriminating against females. Saville said yes, and provided him with a few examples as to how she believed the jail was discriminating against female employees, such as the following:

13

a)   female employees generally only worked in the female housing units while male employees were allowed to work in both female and male housing units;

b)   female staff were not allowed to participate in cell extractions unless it was a female inmate even though female and male staff received the same training; and

c)   female staff typically did not get picked to receive specialty training, such as being trained in pepper ball, using a taser, and Special Operations Training Team.

77. Saville also informed Corbin that several other female corrections employees felt the same way as she did but were afraid to speak up. They were afraid that if they expressed their opinion about being treated less favorably than male employees, the superintendent and their supervisors would retaliate against them like how they retaliated against her. They did not want to start trouble or be targeted for retaliation.

78. After she said that, Corbin did not address her discrimination concerns, but instead informed her that the original Level-1 discipline was going to remain in her file.  His blatant retaliation surprised her.

79.  Under the County's grievance policy, NRADC did not have the authority to amend Saville's discipline at all.

80. According to Frederick County's Grievance policy, Section 12, Paragraph 12.3(f), "[t]he majority decision of the panel shall be rendered within ten (10) work days of the conclusion of the hearing and **shall be final and binding** and consistent with law and written policies." (emphasis added).

81. The Panel's unanimous decision was finalized in February 2021 and was binding on NRADC; however, NRADC amended Saville's discipline in contravention of the Panel's decision.

82. Saville requested that NRADC remove the amended discipline from her file, but NRADC refused.

14

83. After Saville complained to Corbin in March 2021 about NRADC's discriminatory treatment against females, Saville received her performance review in May 2021. NRADC gave Saville a lower rating than her previous year's evaluation for the Work Habits, Appearance, and Interpersonal Relations categories.

84. In the Work Behavior Comment section, Custer stated: "*Last year September 21st 2020, you received a level I discipline for unprofessional behavior toward a subordinate. We had talked about issues such as these before this incident occurred. This is the reason for the improvement needed for interpersonal relations. After this discipline was issued your sensitivity and attitude suffered for a considerable time.* ***You struggled to come to terms with this discipline. This is the reason your Work Habits suffered****.*"(emphasis added).

85. Custer's comment and low scoring on Saville's performance review were retaliatory because he specifically referenced the disparate discipline that the Panel reversed. He also disregarded Saville's work ethic before the 75-second incident. He also blatantly punished her for appealing the decision citing her "struggle to come to terms with this discipline."

86. His comments on Saville's work habits were also inaccurate because she continued to be a rule follower and maintained a professional demeanor throughout the investigation, the appeal process, and up to her wrongful termination. She did not allow the incident to have any negative impact on her work ethic or attitude throughout the year.

87. A few days after receiving the evaluation, Saville expressed her concerns with Custer about the retaliatory evaluation. However, Custer did not change her score to accurately reflect her work habits.

88. Saville brought the same concerns about the retaliatory performance evaluation to Corbin's attention. Corbin agreed that her work habits had not suffered after she was disparately disciplined in October 2020.

15

89. Corbin assured Saville that he would change the evaluation before it was sent to the County for filing.

90. Despite giving his word, Corbin did *not* change Saville's score. This retaliatory action had adverse consequences on Saville. Not only did it tarnish her reputation, but it negatively impacted the amount of her yearly bonus.

**NRADC Continued to Target Saville and Disparately Discipline Her for Conduct that Male Employees Were Not Disciplined For**

91. After she complained of sex discrimination in March 2021 and in May 2021, NRADC took further retaliatory action against Saville and began disciplining her for either accidents that had no adverse impact on the jail or inmates, or for conduct that her male comparators were not disciplined for.

92.  On June 18, 2021, Saville accidently locked her keys in the armory. Saville reported the incident immediately and assisted in resolving the issue. She also implemented procedures to prevent this kind of incident from ever happening again.

93. The accident did not threaten anyone's safety or raise any security issues, but Custer still gave Saville a supervisor counseling on June 22, 2022, which was retaliatory because in her 13 years' at NRADC, Saville had never seen any male employee receive a write up for a similar accident. Custer disparately disciplined Saville shortly after she expressed her concerns to him about his retaliatory performance evaluation in May 2021.

94. It is common for lieutenants to work additional hours because the jail allots them a certain amount of overtime. In Saville's own job description as the Lieutenant of Security & Operations, it states that she "**[m]ust at times be able to work irregular hours**." (emphasis added).  Yet, in July 2021, Custer reprimanded Saville because she worked a few extra hours past the ending of some of her shifts and told her that she needed to stick to her set hours. Saville had to work

16

those additional hours because she was either helping out the understaffed security team or she was in the middle of an investigation.

95. In contrast, NRADC allowed the male lieutenants, such as Lieutenant John Derito, to clock up to 45 hours of overtime.

96. On August 19, 2021, Saville arrived to work a few minutes late because she was stuck at a train crossing. Saville promptly informed Custer that she was running late due to the train. Saville was only *2 minutes* late, however, Custer wrote her up and referenced a few other occasions where she allegedly arrived late to work.

97. Saville rarely arrived late to work. In the rare occasion that she did, it was only by a few minutes because she was stuck at the train crossing, which was outside of her control.

98. Nevertheless, Custer disciplined Saville even though male lieutenants who arrived 5 to 10 minutes late to work for reasons outside their control (or even reasons within their control), were not disciplined.

99. In August 2021, Custer told Saville that she was not allowed to park in certain parking spaces at NRADC. These parking spaces, although not clearly marked, were reserved for "Command Staff," however, Saville often parked in the parking spaces *next to* these reserved spots, which she had previously been allowed to do before she engaged in protected activity. After engaging in protected activity, Custer informed Saville that she was no longer allowed to park there. Never mind several male employees of lower rank continued to park in those parking spaces without facing any discipline from Custer or other jail management.

**NRADC Imposes Additional Work Requirements on Saville That It Had Not Imposed on Her Male Comparator**

100. In February 2022, after Saville completed her three-year time commitment as Lieutenant of Classification and Safety, NRADC placed her in the position of Director of Staff Development.

101. Saville was no longer under the supervision of Custer, but was now supervised by the female Captain of Administrative Services, Patty Barr.  Upon information and belief, Barr only supervises females such as Saville, Correctional Officer and Facility Investigator, Kim Benson, and Sargent, Delilah Mays. Whereas Custer now only supervises *male* lieutenants.

102. As the Director of Staff Development, NRADC leadership gave Saville additional job duties that it did not assign to her predecessor,  Lieutenant Mike Parker. When NRADC gave Saville her job description, she was also given another paper, which included *additional* tasks that NRADC did not assign to Parker. For example, Saville became responsible for making all the sick calls and doctor calls, which Parker was not required to do.

103. Medical staff even asked Saville why she was making the sick calls and doctor calls, since Parker never made such calls as the former Director of Staff Development.

104. Additionally, when Saville became the new Director of Staff Development, Parker took Saville's position of Lieutenant of Classification and Safety even though he did not fulfill the three-year time commitment for the Director of Staff Development position. Yet, NRADC bent the rules for him allowing him to take on the specialty position that Saville had held.

105. Saville wonders if she was placed under a female supervisor and given additional work requirements outside of her job description in retaliation for making complaints of discrimination.

**Damages**

106. Saville has faced disparate treatment in discipline and pay due to her protected activity. The examples above show the egregious coordinated attempts by NRADC's leadership to continue to target and retaliate against Saville due to her sex, and due to her complaints of discrimination, retaliation, and opposition to NRADC's unlawful behavior.

107. NRADC's ongoing discrimination and retaliation against Saville have changed her and have

significantly affected her mentally, emotionally, physically, and financially. She endured an enormous amount of stress and anxiety. She suffered through depression, daily headaches, loss of sleep, loss of appetite and loss of reputation.

108. The stress from NRADC's actions have affected Saville's personal life, as well and has drained her of her desire to even leave her house due to the embarrassment. Additionally, because of the retaliatory performance evaluation, Saville's yearly bonus has been impacted and Saville is still the lowest paid lieutenant out of the seven other male lieutenants to her knowledge.

### COUNT I: SEX DISCRIMINATION IN VIOLATION OF TITLE VII

109. Plaintiff incorporates all the allegations contained in paragraphs 1-108, as if stated herein.

110. Under Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice for an employer to discriminate against any individual with respect to the terms, conditions, or privileges of employment because of an individual's sex. 42 U.S.C. § 2000e, *et seq*.

111. Plaintiff specifically invokes the Lilly Ledbetter Fair Pay Act provisions of Title VII.

112. Defendant was at all times relevant to this matter, the employer of Saville for purposes under Title VII.

113. Plaintiff was fully qualified to perform her lieutenant position and had performed successfully in her role.

114. Despite her qualifications, Defendant discriminated against Plaintiff in violation of Title VII by subjecting her to different and adverse treatment on the basis of her sex. NRADC treated Saville, the only female lieutenant, less favorably than it treated the male lieutenants and other male employees and paid her less than her male comparators.

115. More specifically, Plaintiff was subjected to less favorable terms and conditions of employment because of her sex, as described in ¶¶ 27-43, 45-47, 52-53, 56-71, 78-105, and was disparately disciplined in comparison to her male comparators who engaged in similar behavior or reckless

19

and negligent behavior, as described in ¶¶ 27-34, 37-39, 42, 56-64, 91-99.

116. Plaintiff suffered adverse action when 1) NRADC gave her a Level 1 Reprimand with one day of suspension without pay on October 5, 2020; 2) NRADC wrongfully fired her on November 2, 2020, for pretextual reasons; 3) NRADC paid her the lowest salary out of the seven other male lieutenants; 4) NRADC re-issued the original Level-1 discipline against her and kept it in her file; 5) Custer gave her a lower rating in her performance evaluation in May 2021 for the Work Habits, Appearance, and Interpersonal Relations categories; 6) NRADC gave her additional work requirements that it did not impose on a male comparator; and 7) NRADC continued to disparately discipline her when she returned to work after she was reinstated, see ¶ 91-99.

117. Defendant's policies, practices, and/or procedures produced a disparate impact on Plaintiff with respect to her wages and other terms and conditions of her employment.

118. Defendant's discrimination against Saville was an intentional or reckless disregard of her rights under Title VII.

119. Defendant engaged in the discriminatory actions described above with malice, or with a reckless indifference to Saville's legal rights, subjecting her to adverse terms and condition of employment because of her sex. Title VII provides that Saville is therefore entitled to punitive damages for Defendant's actions alleged herein.

120. Saville has been damaged as a result of Defendant's willful, intentional, and unlawful conduct. As a direct and proximate result of Defendant's conduct, Saville has suffered, continues to suffer, and will in the future suffer, a loss in wages and benefits, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, distress, embarrassment, other pecuniary and non-pecuniary losses, injury and damages including damage to her reputation and good will, backpay, litigation expenses including attorney's fees, and consequential damages, and other injuries.

20

121. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII, including an award of punitive damages. Reasonable attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT II: SEX DISCRIMINATION IN VIOLATION OF THE VHRA

122. Plaintiff incorporates all the allegations contained in paragraphs 1-121, as if stated herein.

123. Under the VHRA, it is an unlawful employment practice for an employer to discriminate against any individual with respect to the terms, conditions, or privileges of employment because of an individual's sex. Va. Code § 2.2-3900 *et seq*.

124. Defendant was at all times relevant to this matter, the employer of Saville for purposes under the VHRA.

125. Plaintiff was fully qualified to perform her lieutenant position and had performed successfully in her role.

126. Despite her qualifications, Defendant discriminated against Plaintiff in violation of the VHRA by subjecting her to different and adverse treatment on the basis of her sex. NRADC treated Saville, the only female lieutenant, less favorably than it treated the male lieutenants and other male employees and paid her less than her male comparators.

127. More specifically, Plaintiff was subjected to less favorable terms and conditions of employment because of her sex, as described in ¶¶ 27-43, 45-47, 52-53, 56-71, 78-105, and was disparately disciplined in comparison to her male comparators who engaged in similar behavior or reckless and negligent behavior, as described in ¶¶ 27-34, 37-39, 42, 56-64, 91-99.

128. Plaintiff suffered adverse action when 1) NRADC gave her a Level 1 Reprimand with one day of suspension without pay on October 5, 2020; 2) NRADC wrongfully fired her on November 2, 2020, for pretextual reasons; 3) NRADC paid her the lowest salary out of the seven other male lieutenants; 4) NRADC re-issued the original Level-1 discipline against her and kept it in her file;

21

5) Custer gave her a lower rating in her performance evaluation in May 2021 for the Work Habits, Appearance, and Interpersonal Relations categories; 6) NRADC gave her additional work requirements that it did not impose on a male comparator; and 7) NRADC continued to disparately discipline her when she returned to work after she was reinstated, see ¶ 91-99.

129. Defendant's policies, practices, and/or procedures produced a disparate impact on Plaintiff with respect to her wages and other terms and conditions of her employment.

130. Defendant's discrimination against Saville was an intentional or reckless disregard of her rights under the VHRA.

131. Defendant engaged in the discriminatory actions described above with malice, or with a reckless indifference to Saville's legal rights, subjecting her to adverse terms and conditions of employment because of her sex. The VHRA provides that Saville is therefore entitled to punitive damages for Defendant's actions alleged herein.

132. As a direct and proximate result of Defendant's willful, intentional, and unlawful conduct, Saville has suffered, continues to suffer, and will in the future suffer, a loss in wages and benefits, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, distress, embarrassment, other pecuniary and non-pecuniary losses, injury and damages including damage to her reputation and good will, backpay, litigation expenses including attorney's fees, and consequential damages, and other injuries.

133. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the VHRA.

## COUNT III: RETALIATION FOR OPPOSING SEX DISCRIMINATION IN VIOLATION OF TITLE VII

134. Plaintiff incorporates all the allegations contained in paragraphs 1-133, as if stated herein.

22

135. Under Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice for an employer to retaliate against any individual by taking an adverse action because of the individual's opposition to any practice made illegal by Title VII.

136. Plaintiff specifically invokes the Lilly Ledbetter Fair Pay Act provisions of Title VII.

137. Plaintiff engaged in protected activity and Defendant, Corbin, and Custer were aware of her protected activity, as described in ¶¶ 27-28, 33-34, 44, 72-74, 76-77, 87-88.

138. Defendant subjected Plaintiff to retaliation for her engaging in protected activity, as described in ¶¶ 29, 35-43, 52-55, 65-105.

139. Plaintiff was fully qualified to perform her position as a lieutenant and had performed successfully in her role.

140. At the time Defendant retaliated against Plaintiff, NRADC management was aware that Plaintiff had complained about sex discrimination in the workplace.

141. NRADC's conduct in disparately disciplining Saville would likely dissuade a reasonable worker from raising sex disparity complaints against the company.

142. NRADC's conduct of wrongfully terminating Plaintiff in November 2020, disparately disciplining her, paying her less than her male comparators, and giving her a low rated performance review after complaining of gender disparity, was done in retaliation for Plaintiff's opposition to practices made illegal under Title VII.

143. Defendant's conduct was intentional, malicious, and recklessly indifferent to Plaintiff's statutory rights.

144. As a direct and proximate result of the acts and omissions of Defendant, as described above, Plaintiff suffered a loss in wages and benefits, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and non-pecuniary losses.

23

145. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the anti-retaliation provision of Title VII, including an award of punitive damages. Reasonable attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k)

## COUNT IV: PAY DISCRIMINATION IN VIOLATION OF THE EPA

146. Plaintiff incorporates all the allegations contained in paragraphs 1-145, as if stated herein.

147. Defendant has discriminated against Plaintiff in violation of the EPA by subjecting her to unequal pay on the basis of sex, as described in ¶¶ 65-71.

148. Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions. Defendant also discriminated by subjecting her to less pay and benefits in violation of the EPA.

149. As a direct and proximate result of Defendant's willful, knowing and intentional discrimination, acts or omissions, as described herein, Plaintiff has suffered harm, including but not limited to, lost wages, lost benefits, diminished future earning capacity, and other pecuniary and non-pecuniary losses.

150. Plaintiff should be awarded all legal and equitable remedies, including underpaid wages, doubled compensatory or punitive damages for all willful violations and reasonable attorneys' fees under 29 U.S.C. § 216, *et seq*.

151. Plaintiff should be awarded the entire amount of underpayment, interest, costs, reasonable attorneys' fees and other statutory penalties or relief as may be allowed by the Court pursuant to the EPA.

## COUNT V: RETALIATION IN VIOLATION OF THE EQUAL PAY ACT

152. Plaintiff incorporates all the allegations contained in paragraphs 1-151, as if stated herein.

153. Plaintiff alleges that she suffered retaliation and harm because of her protected activity, in violation of 29 U.S.C. § 215(a)(3).

154. As a result of Defendant's willful retaliation, Plaintiff has suffered and continues to suffer materially adverse harm, including but not limited to lost wages and benefits, diminished employment opportunities, and humiliation, embarrassment, emotional and physical distress, and mental anguish.

155. By reason of Defendant's willful retaliation, Plaintiff is entitled to all remedies available for violations of the anti-retaliation provision of the Equal Pay Act, as incorporated into the Fair Labor Standards Act, including punitive and compensatory damages.

156. As a direct and proximate result of the acts and omissions of Defendant, as described above, Plaintiff suffered a loss in wages and benefits, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and non-pecuniary losses.

## PRAYER FOR RELIEF

**NOW, WHEREFORE,** Plaintiff Jacqualine Saville respectfully requests that this honorable Court enter judgment in her favor on all counts, and against Defendant as follows:

a. Declare that the conduct of Defendant is a willful violation of the Plaintiff's rights as secured by Title VII, the VHRA, and the EPA;

b. Award Saville punitive damages in an amount to be shown at trial;

c. Award Saville full back pay including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, bonuses, cash awards, loss of retirement savings and benefits, and other remuneration and privileges of employment retroactive to the date of any unlawful action found to have occurred in this case;

d. Award Saville front pay and pecuniary and out-of-pocket expenses;

e.  Order Defendant to pay all reasonable attorneys' fees, court costs, and expenses

incurred by Saville as a result of Defendant's actions and inactions, as well as pre-

and post-judgment interest;

f.  Grant Saville such other and further relief as justice may require and are within

the equitable powers for this honorable Court.

## JURY DEMAND

Plaintiff seeks a trial by jury on all matters and issues that can be so tried.


Dated: October 4, 2022                                    Respectfully Submitted,


                                                          **JACQUALINE SAVILLE**
                                                          By Counsel:


                                                          _/s/_____

                                                          Monique A. Miles, Esq.
                                                          VA Bar No. 78828
                                                          Old Towne Associates, P.C.
                                                          216 South Patrick Street
                                                          Alexandria, VA 22314-3528
                                                          Phone: 703-519-6810
                                                          mmiles@oldtowneassociates.com

                                                          *Counsel for Jacqualine Saville*

26