**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **JACQUALINE SAVILLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 5:22-cv-057** |
| | ) | |
| **v.** | ) | **By:  Michael F. Urbanski** |
| | ) | **Chief United States District Judge** |
| **NORTHWESTERN REGIONAL** | ) | |
| **JAIL AUTHORITY, et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION</u>**

This matter comes before the court on a Motion to Dismiss Plaintiff Jacqualine Saville's Second Amended Complaint ("SAC"), ECF No. 40, filed by defendants Northwestern Regional Jail Authority ("NRJA"), Clay Corbin ("Corbin"), individually and in his official capacity as Superintendent of the Northwestern Regional Adult Detention Center ("NRADC"), and Kim Benson ("Benson), individually and in her official capacity as Sergeant and NRADC Investigator. The SAC, ECF No. 38, includes claims for sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count One, against the NRJA); Sex Discrimination in violation of the Virginia Human Rights Act ("VHRA") (Count Two, against all defendants); retaliation in violation of Title VII (Count Three, against the NRJA); pay discrimination in violation of the Equal Pay Act ("EPA") (Count Four, against the NRJA); retaliation in violation of the EPA (Count Five, against the NRJA); and defamation (Count Six, against all defendants).

The defendants now seek to dismiss Counts One, Two, and Six. Mot. Dismiss, ECF No. 40; Mem. in Supp. Mot. Dismiss, ECF No. 41. For the following reasons, the motion to

dismiss is **DENIED** as to Count One, **GRANTED** as to Count Two, and **GRANTED** as to Count Six.

## I.  Background

The following facts are drawn from the SAC. ECF No. 38. Saville began working for NRJA as a correctional officer ("CO") in July 2008 and held the rank of lieutenant at all times relevant to the complaint. Id. at ¶ 8. Saville had received positive reviews on her recent annual performance review, including a 3.9 out of 4 in 2020. Id. at ¶ 28.

As described in greater detail below, Saville was originally reprimanded and terminated following an incident on September 21, 2020 ("September 21 Incident"). Following an appeal, Saville was reinstated to her position. After her reinstatement, Saville alleges that she suffered several forms of retaliation, which led Saville to file the instant lawsuit on October 4, 2022. The NRJA again fired Saville on November 29, 2022, allegedly for an incident that occurred on September 16, 2020 ("September 16 Incident"). Saville then amended her complaint to include this new allegation, see First Amended Complaint, ECF No. 18, and amended her complaint once more to include additional information related to her Frederick County grievance proceedings, Pl.'s Mot. Leave Am. Compl., ECF No. 33.

### A.  The September 21 Incident and First Termination

The September 21 Incident occurred shortly after an inmate was cleared from suicide observation. Jail staff attempted to place the inmate in a joint cell with another individual, but the inmate refused the placement. Id. at ¶ 33–34. Saville escorted this inmate to booking and informed Sergeant Jason Mowery ("Mowery") that the inmate needed a temporary cell placement in booking while awaiting a longer term solution. Id. at ¶ 34. Saville's subordinate,

Officer Cody Landis ("Landis"), "inappropriately interjected himself" into this conversation and loudly told Saville that the CO who had cleared the inmate from suicide observation, Kevan Frye ("Frye"), had said that the inmate could have a single cell. Id. at ¶ 35.

Saville believed it safer to place this inmate in a joint cell, in accordance with NRADC policy. Id. at ¶ 38. After Saville repeated her request for Mowery to provide a temporary cell for this inmate, Landis again "loudly challenged" Saville. Id. at ¶ 39. Saville instructed Landis not to undermine her authority in front of an inmate. Id. at ¶ 40. Landis responded by yelling and cursing at her. Id. Seeking de-escalation, Saville left the area and reported the September 21 Incident. Id.

### 1.    Discipline and Appeal

On September 25, 2020, Captain Heath Custer ("Custer"), Saville's direct supervisor, told Saville that he recommended a Level-1 Reprimand for Saville's conduct during the September 21 Incident. Id. at ¶ 41. Saville questioned whether this was fair, given that the NRJA did not discipline Landis or other male employees for similar or worse behavior. Id. Custer responded by saying, "Saville, you do not want to be one of those people, you know how those people are treated." Id. at ¶ 42. Saville replied that NRJA was treating her unfairly and discriminating against her as a female CO, since she was the only employee to be disciplined. Id. On October 5, 2020, Saville received the Level-1 Reprimand with one day of suspension without pay. Id. Saville contends that this discipline out of step with the write up indicated by the Frederick County Policy of Progressive Discipline. Id. at ¶¶ 44–46.

Saville requested that the NRJA alter her punishment to a write up, so that her discipline would be in accordance with policy, but the NRJA refused. Id. at ¶ 46.

## 2. Internal Affairs Investigation

Saville then appealed the reprimand to the NRJA superintendent. Id. at ¶ 47. Superintendent Jim Whitely ("Whitely") ordered an internal affairs ("IA") investigation into these events, but indicated that he disapproved of Saville's decision to appeal. Id. at ¶ 48. The NRJA then placed Saville on administrative leave. Id. at ¶ 49. Custer sent out an unprecedented email, notifying the entire jail staff that Saville was on leave pending the outcome of an IA investigation. Id. This email violated Northwestern Regional Jail General Order #3, which provides that "[n]o information regarding an Internal Affairs investigation shall be released to any party without the express approval of the Superintendent. The prohibition includes release of information concerning the parties involved and the events." Id. at ¶ 51.

## 3. First Termination & Grievance Proceedings

The NRJA terminated Saville's employment on November 2, 2020. Id. at ¶ 54. The NRJA cited three reasons, id., which Saville argues are pretextual:

1. Saville disregarded the inmate's safety during the September 21 Incident by not placing him in a single cell, even though doing so would have violated NRJA policy;

2. Saville cursed at Landis during the September 21 Incident, even though witness testimony indicated that Landis also cursed at Saville but received no discipline;

3. Saville was untruthful during the investigation of the September 21 Incident and lied about her awareness of the availability of a single cell for the inmate, even though she did not lie, was not aware of an available single cell, and the single cell would have been improper for the inmate based on NRJA policy.

4

The NRJA replaced Saville with a male lieutenant. Id. at ¶ 55. Saville appealed her termination to the Human Resources Director, County Administrator, and a Step IV Grievance Panel per the Frederick County Grievance Policy and Procedure. Id. at ¶ 56.

The Step IV Grievance Panel ultimately concluded that it "could not support the termination of an exemplary employee of 12 years who had exceptional performance review[s] up until this time." Id. at ¶ 59. The panel restored Saville to her position with full back pay. Id. at ¶ 60.

## B.  Retaliatory Events Between Terminations

When Saville returned to work on March 1, 2021, following her reinstatement, she met with Superintendent Clay Corbin ("Corbin"). Id. at ¶ 85. Corbin told her: "[T]he one thing I really didn't like was how your attorney kept making comments about the jail discriminating against females." This comment made Saville uncomfortable, as she believed it implied that Saville had acted inappropriately by raising her genuine concerns about sex discrimination with the Panel. Id. Corbin also asked Saville if she truly believed that the NRJA discriminated against female employees. Id. at ¶ 86. Saville replied in the affirmative and provided several examples, including that (1) female employees generally worked only in female housing units while male employees could work in either unit; (2) female employees could only participate in cell extractions for female inmates, despite both male and female employees receiving the same training; and (3) female staff were less likely to receive specialty training. Id.

Corbin did not address these concerns, but instead told her that the Level-1 Reprimand would remain in Saville's file. Saville believed that this was both retaliatory and an improper

amendment of the Level IV Grievance Panel's unanimous decision, and requested that the notation be removed, but Corbin declined to do so. Id. at ¶¶ 88–92.

While the Level IV Grievance Panel had ordered that Saville be reinstated to her prior position as Lieutenant of Classification and Security, when Saville returned to work on March 1, 2021, she found that she had been replaced by a male lieutenant. Id. at ¶ 85. Corbin tried to place her in a different position, but reluctantly allowed her to return to her former role. Id.

Saville received lower marks on her 2021 performance review in the categories of work habits, appearance, and interpersonal relations than in the prior year. Id. at ¶ 93. In one comment section, Custer noted the Level 1 Reprimand that Saville had received and stated that "[Saville] struggled to come to terms with this discipline. This is the reason your Work Habits suffered." Id. at ¶ 94. Saville characterizes this as retaliatory, because it referenced the disparate discipline the Panel reversed, and penalized her by characterizing her disciplinary appeal as "struggling to come to terms" with the reprimand. Id. at ¶ 95. Saville disputes that her work or attitude suffered in any way. Id. Saville expressed concerns about the evaluation to both Corbin and Custer. Id. at ¶¶ 97–98. Custer agreed that her work habits had not suffered and said he would change the evaluation before it was sent to the county, but did not. Id. at ¶¶ 98–99. This negatively affected Saville's annual bonus and her reputation. Id. at ¶ 100.

Saville alleges that she was subjected to additional instances of retaliation, such as discipline for accidents that had no adverse impact or conduct for which male comparators received no discipline. Id. at ¶ 101. First, on June 18, 2021, Saville accidentally locked her keys in the armory, immediately reported and resolved the incident, and implemented procedures to prevent its recurrence. Id. at ¶ 102. Custer gave Saville a supervisor counseling for the

incident, which no male employee had received for similar instances in Saville's thirteen years with NRJA. Id. at ¶ 103. Second, while other employees worked overtime and her job description referenced irregular hours, Saville was reprimanded for failing to keep to her set hours, while male comparators were able to accrue up to forty-five hours of overtime. Id. at ¶¶ 104–05. Third, when Saville once arrived two minutes late because she was stuck at a train crossing, Custer wrote her up, even though male lieutenants who arrived five to ten minutes late for similar reasons were not disciplined. Id. at ¶ 108. Fourth, Custer prohibited Saville from parking in certain parking spaces adjacent to spots reserved for high-ranking staff, which she had been permitted to do prior to engaging in protected activity and that lower-ranking male employees were permitted to do without discipline. Id. at ¶ 109.

In February 2022, after Saville completed her term as Lieutenant of Classification and Safety, NRJA placed her as Director of Staff Development. Id. at ¶ 110. In this new role, female Captain of Administrative Services Patty Barr ("Barr") replaced Custer as Saville's supervisor. Id. at ¶ 111. With this change, Barr only supervised female employees and Custer male. Id. In this new role, NRJA gave Saville additional job duties that were not part of the responsibilities performed by Saville's male predecessor. Saville "wonders" whether this placement was retaliatory. Id. at ¶ 115.

### C.  September 16 Incident and Second Termination

Based on the facts above, Saville filed this suit on October 4, 2022. Compl., ECF No. 1. The NRJA was served on October 17, 2022. ECF No. 5. Two days after learning of this lawsuit, the NRJA initiated a new disciplinary action against Saville based upon an incident

that occurred two years prior—the September 16 Incident—and which ultimately led to Saville's termination on November 29, 2022. SAC, ECF No. 38, at ¶¶ 116–17.

### 1.      September 16 Incident

On September 16, 2020, in the middle of the COVID-19 pandemic, a female inmate charged with felony assault on law enforcement was transferred to NRJA. Id. at ¶ 126. This inmate was larger in size than Saville. Id. at ¶¶ 127, 133. Consistent with NRJA's COVID policy, Saville requested that the inmate step forward so that Saville could take the inmate's temperature. Id. at ¶ 127. The inmate refused, repeatedly moving away from Saville as Saville tried to approach with a thermometer. Id. Saville "secured" the inmate's head and took her temperature. Id.

Then, despite the inmate's leg shackles and cuffed hands, the "inmate moved towards [Saville] aggressively and elbowed [Saville] hard in her ribs." Id. Saville first responded by using a one arm strike—importantly not a punch to the head—and attempting to control the inmate's head. Id. at ¶ 128. As the inmate continued to resist, Saville administered several more arm strikes across the inmate's right shoulder and back, as well as knee strikes to the inmate's right upper arm area. Id. at ¶ 129. No strike made contact with the inmate's head. Id. Eventually, the inmate was taken to the pat search area, where the inmate continued to be uncooperative and Saville twice used her foot to kick the inmate's feet apart. Id. at ¶ 129–30. Following the search, the inmate was placed in a booking area to see a magistrate. Id. at ¶ 131. At no point did this inmate indicate that she had been injured. Id.

There were ten individuals in the pat down room during the September 16 Incident, including jail staff and police officers. Id. at ¶ 133. None objected to Saville's use of force. Id.

Several employees entered the room prepared to assist Saville, suggesting that they recognized that the arrested inmate was combative, dangerous, and resisting. Id.

The NRJA Standard Operating Procedure ("SOP") 7.13 governs the use of force, stating that "only the minimum force necessary" should be "used to effect lawful objectives," such as "to control inmates." Id. at ¶ 134. When physical force is used for "justifiable self-defense" or "orderly operation of the facility," the SOP manual requires the preparation of a written report to be submitted to the Administrator for review. Id. Saville prepared a written report on September 16, 2020, which sent a notification to Saville's then-Supervisor, Custer, for review. Id. at ¶¶ 118, 125, 134. This email informed Custer that the report was saved as a draft in the online system, meaning that it was ready to be approved by a supervisor. Id. at ¶ 118. Per the SOP manual, supervisors like Custer are responsible for reviewing and approving reports prepared by subordinates. Id. This report remained an unreviewed draft for at least two years, as it still displayed as a draft on November 29, 2022. Id.

Saville also spoke with her supervisor Custer about the incident, describing the encounter and requesting guidance since Custer and the Superintendent had provided information regarding inmate arrivals during COVID. Id. at ¶ 121.

Officers used force against the inmate involved in the September 16 Incident at least three other times, indicating that this inmate was frequently violent and noncooperative. Id. at ¶ 153.

### 2.      Internal Affairs Investigation

The NRJA took no disciplinary action from the date of the September 16, 2020, Incident until two days after they received notice of this lawsuit. Id. at ¶¶ 123, 152.

Benson, an IA investigator, questioned Saville about the September 16 Incident on November 2, 2022. Id. at ¶ 124. Benson asked Saville why she used closed-fist punches, Saville responded that she did not recall using punches, and Benson told her that the video showed four punches. Id. This was not an accurate description of the video, which shows Saville using arm strikes and is consistent with Saville's written report. Id. at ¶¶ 124–25. Benson and Saville had previously and briefly discussed this incident sometime after March 1, 2021, when Saville inquired as to whether she was in trouble for it. Benson told Saville that Benson did not remember the incident and that there therefore must not be anything to be concerned about. Id. at ¶ 122.

Despite no contemporaneous complaints of injuries, Benson and Corbin claim in the IA documents that the inmate involved in the September 16 Incident had a knot on the left side of her forehead that was absent prior to the Incident. Id. at ¶ 132. Footage that would have shown such an injury is "mysteriously missing." Id. Corbin also falsely claimed that Saville had not reported this incident to her supervisor. Id. at ¶ 120. Saville claims that Benson made false statements in her IA Investigation Report. Id. at ¶¶ 15–16.

On November 29, 2022, Corbin gave Saville an Intent to Terminate Memorandum ("Termination Memo"), explaining that Saville's employment was terminated for using excessive force in the September 16 Incident. Id. at ¶ 117. Saville claims that this letter contains several material omissions and falsehoods. Specifically, the letter omits that the inmate struck Saville in the ribs during the Incident and falsely states that an officer had ahold of Saville's jacket and directed Saville to stop administering punches and knee strikes. Id. at ¶ 135.

10

Saville claims that Corbin's Termination Memo included several false and defamatory statements. Id. at ¶ 11. Corbin published these false statements "for jail staff to see" and during appeals process. Id. at ¶ 12–13. Corbin allegedly relied on Benson's statements in his memo. Id. at ¶ 17.

Saville was denied a position with the Department of Homeland Security because the NRJA shared these false statements with a background investigator. Id. at ¶ 18.

Unlike other excessive force complaints involving male staff, the NRJA referred investigation of the September 16 Incident to the Commonwealth's Attorney Office and the Sheriff's Office. Id. at ¶ 138..

### D. Pattern and Practice of Discrimination in Pay and Discipline

Throughout the complaint, Saville claims that the NRJA imposed harsher discipline on her for the September 21 Incident than it did on male employees for similar or worse behavior. Id. at ¶¶ 68–76. For example, officers who lost their firearms—a safety issue, unlike Saville locking her keys in the armory—received no disciplinary action, despite the firearms being recovered by a civilian. Id. at ¶ 72. A male officer who used excessive force twice within an hour received a Level-1 Disciplinary Action and temporary administrative leave, not termination. Id. at ¶ 73. Other use-of-force incidents resulted in discipline less severe than a termination. Id. at ¶¶ 143–48. Furthermore, Saville believes that no other use-of-force incident was submitted to the Commonwealth's Attorney for review. Id. at ¶ 140.

Finally, Saville claims that she was paid less than her male counterparts, despite having more experience than many of them. Id. at ¶¶ 77–81.

### II. Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." Id. at 679; see also Simmons v. United Mortg. & Loan Invest., 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.") (quotation and emphasis omitted).

A court must consider all well-pleaded allegations in a complaint as true, see Albright v. Oliver, 510 U.S. 266, 268 (1994), and must construe factual allegations in the light most favorable to the plaintiff. See Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005). Nevertheless, a court is not required to accept as true "a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286 (1986), conclusory allegations devoid of any reference to actual events, see United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks omitted). "'Thus, in reviewing a motion to dismiss an action pursuant to Rule 12(b)(6), a court must determine whether it is plausible that the factual allegations in the

complaint are enough to raise a right to relief above the speculative level.'" Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009) (quoting Andrew v. Clark, 561 F.3d 261, 266 (4th Cir. 2009)).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of the allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" Zak v. Chelsea Therapeutics Int'l Ltd, 780 F.3d 597, 606 (4th Cir. 2015) (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011)). However, the court may consider documents outside of the amended complaint if they are "integral to the Complaint" and there is no dispute regarding their authenticity. Goines v. Valley Comm. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016). A document is "integral to the Complaint" where the Complaint "relies heavily upon its terms and effect . . . ." Id. (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

## III.   Analysis

The defendants seek to dismiss the Saville's (A) Title VII discrimination claim; (B) VHRA claim; and (C) and defamation claim. Mot. Dismiss, ECF No. 40; Mem. in Supp. Mot. Dismiss, ECF No. 41. The court considers each claim in turn.

## A.   Count One: Title VII Discrimination Against the NRJA

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

Title VII prohibits both "overt discrimination," known as "disparate treatment discrimination," and "practices that are fair in form, but discriminatory in operation," known as "disparate impact discrimination." Barnett v. Technology Int'l, Inc., 1 F. Supp. 2d 572, 576 (E.D. Va. 1998) (internal quotation marks omitted) (quoting Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971)). A Title VII plaintiff alleging disparate treatment must allege intentional discrimination and may do so using direct or circumstantial evidence. Spencer v. Virginia State University, 919 F.3d 199, 207 (4th Cir. 2019). In the alternative, she may use the burden shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

"[T]he plaintiff is not required to make out a prima facie case or satisfy any heightened pleading requirement at the motion to dismiss stage." Robinson v. Procter & Gamble Manufacturing Company, No. 1:18CV133, 2019 WL 1005504, *2 (M.D.N.C. 2019) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 2002) and McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 584-85 (4th Cir. 2015)). But the plaintiff must plead facts that allow to the court to reasonably infer each element of the prima facie case, including that she was treated less favorably than similarly situated employees outside the protected class. Id. (citing McCleary-Evans, 780 F.3d at 585). Where a prima facie case of wage discrimination is based on comparators, the plaintiff must show that she is paid less than men in similar jobs. Spencer, 919 F.3d at 207 (citing Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir. 1994)).

Saville pleads facts sufficient to state a Title VII discrimination claim, as she alleges that she was treated less favorably than, paid less money than, and disciplined more harshly than male lieutenants and other male employees. SAC, ECF No. 38, at ¶¶ 161–73. Saville claims

that she suffered the following adverse actions: (1) a Level-1 Reprimand with one day suspension without pay on October 5, 2020, related to the September 20 Incident; (2) wrongful termination on November 2, 2020 and November 2022 for pretextual reasons; (3) lower pay than the seven other male lieutenants; (4) re-issuance of the Level-1 Reprimand after the Grievance Panel overturned her discipline; (5) a lower employment review in May 2021; (6) additional burdensome work not required of a male comparator; (7) disparate discipline after her reinstatement; and (8) suspension and (9) termination for incidents less egregious than those in which male comparators were involved. Id. at ¶ 168.

The defendants contend that seven of these nine alleged adverse actions are insufficient to state a Title VII sex discrimination claim. Mem. Supp. Mot. Dismiss, ECF No. 41, at 4. The defendants do not contest that Saville's allegations related to lower pay and additional work are sufficient to state a Title VII discrimination claim. Id. Therefore, this claim survives the motion to dismiss.

While some of the actions Saville labels adverse likely do not qualify as the basis for a stand-alone Title VII claim—for example, negative performance reviews are generally not independently actionable, James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 377 (4th Cir. 2004)—these allegations provide important context for considering Saville's discrimination claim in its totality. Finally, the defendants object to Saville's inclusion of her termination as both discriminatory and retaliatory for Title VII purposes. Id. However, Saville is permitted to plead these theories in the alternative.

### B.  Count Two: VHRA Discrimination Against All Defendants

The court dismisses Count Two without prejudice, because Saville failed to obtain the required notice of right to sue from the Virginia Office of Civil Rights ("VOCR"). The VHRA provides that "an aggrieved person who has been provided a notice of his right to file a civil action pursuant to § 2.2-3907 may commence a timely civil action" for violations of the act. Va. Code Ann. § 2.2-3908. See Tattrie v. CEI-Roanoke, LLC, No. 7:23-CV-079, 2023 WL 4186383, at *3 (W.D. Va. June 26, 2023) (determining that the EEOC's right-to-sue notification does not permit an individual to file suit under the VHRA and dismissing the claim without prejudice to permit the plaintiff to obtain the required notice from the state). Saville originally filed her suit with the VOCR, which transferred her Charge to the EEOC. SAC, ECF No. 38, at ¶¶ 22–26. The EEOC ultimately issued her the requisite notice of right to sue for her Title VII claims. Id. As Saville may not bring a VHRA claim without a right-to-sue notice from the VOCR, her VHRA claim against the NRJA is dismissed without prejudice.

However, should Saville obtain a right-to-sue notice from the VOCR and amend her complaint, she would still fail to state a claim as to Corbin and Benson, as they do not fall within the statutory definition of "employer."

Virginia Code § 2.2-3905(B)(1) makes it "an unlawful discriminatory practice" for an employer to "discharge[ ] or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's . . . sex."

Further,

> "Employer" means a person employing (i) 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person or (ii) one or more domestic workers. However, (a) for

16

> purposes of unlawful discharge under subdivision B 1 on the basis of race, color, religion, national origin, military status, sex, sexual orientation, gender identity, marital status, disability, pregnancy, or childbirth or related medical conditions including lactation, "employer" means any person employing more than five persons or one or more domestic workers and (b) for purposes of unlawful discharge under subdivision B 1 on the basis of age, "employer" means any employer employing more than five but fewer than 20 persons.

Va. Code § 2.2-3905(A) (emphasis added).

Based on this definition, to the extent Saville's VHRA claim alleges wrongful discharge on the basis of sex in violation of subdivision (B)(1), the operative definition of employer is found in clause (a) of the definition above: "any person employing more than five persons or one or more domestic workers." Va. Code § 2.2-3905(A). Notably, this section does not include any language that could encompass Corbin or Benson.

However, to the extent Saville's VHRA claim is based on actions other than unlawful discharge, the first sentence of the "employer" definition applies: "'Employer' means a person employing (i) 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person or (ii) one or more domestic workers." Va. Code § 2.2-3905(A) (emphasis added).

The parties offer different interpretations of this text. Saville argues that the "and any agent of such person" language allows individual managers and supervisors to be held personally liable to the extent they engage in discriminatory conduct. Pl.'s Opp., ECF No. 42, at 4–5. This interpretation would dramatically expand the scope of the VHRA. Corbin and Benson, on the other hand, argue that the "and any agent of such person" language "provides context for calculating how many persons are employed to determine if a person qualifies as

an employer." Mem. Supp. Mot. Dismiss, ECF No. 41, at 5. While the court acknowledges some indeterminacy in this definition, the court believes that Corbin and Benson have the cleaner reading of the statute: an employer is an entity with fifteen or more employees or agents.

### C.  Count Six: Defamation Against All Defendants

Under Virginia common law, a defamation claim requires the "(1) publication of (2) an actionable statement with (3) the requisite intent." Jordan v. Kollman, 269 Va. 569, 576, 612 S.E.2d 203, 206 (2005).

Saville claims that Corbin and Benson made a variety of defamatory statements about her and that the NRJA, as their employer, is liable under a theory of respondeat superior. Specifically, Saville contends that Corbin made the following defamatory statements in the Termination Memo ("Corbin Statements"):

1.   "The video shows that you were punching with closed fists a fully restrained arrestee/inmate."

2.   "In agreement with the AI [sic] Investigation, I find that On September 16, 2020, you administered several closed fist punches and two knee strikes to a fully restrained arrestee/inmate. Afterwards, while in the pat down area you forcefully kicked the arrestee/inmate's ankles. While you were administering punches/knee strikes an officer had ahold of your jacket telling you to stop."

3.   "[Y]ou intentionally engaged in activity to conceal the nature of the incident."

4.    "You also failed to report this incident to your immediate supervisor per policy."

5.   "You would have most likely been charged and prosecuted for Assault and Battery."

6.   "Your actions represent a gross violation of this trust and our oath."

SAC, ECF No. 38, at ¶ 11. Saville further contends that Benson made defamatory statements ("Benson Statements") about her during interviews (Benson Statements 1–3) and in Benson's November 25, 2022, Internal Affairs Investigation Report (Benson Statements 4–6):

1.   "It was clear that she punched her and she knee struck her in the head?"

2.   "You were in the sally port but I don't know if you were in there when she kicked her foot a couple of times. Do you remember that?"

3.   "Did you tell anybody about those punches and knee strikes?"

4.   "[The Inmate] was taken to the floor with several closed fist strikes being delivered to the head/shoulder area and two knee strikes by Lt. Saville."

5.   ". . . Lt. Saville kicked [the inmate's] ankle twice to separate her feet more to complete a pat down."

6.   "[S]he kicked [the inmate's] ankle twice to move her feet apart further."

Id. at ¶¶ 15–16. Finally, Saville states that the defendants told a Department of Homeland Security background investigator that Saville had engaged in dishonest conduct. Id. at ¶ 18.

The alleged defamatory statements fall into four broad categories:

(i)   statements that Saville punched and kicked the arrestee (Corbin Statements 1–2, Benson Statements 1–2, 4-6)

(ii)  Statements that Saville concealed or failed to report the incident (Corbin Statements 3–4, Benson Statement 3);

(iii) Statements that Saville's conduct could be charged and prosecuted and represented

a gross violation of her trust and oath (Corbin Statements 5–6); and

(iv) Statements made to the Department of Homeland Security.

### 1.     Actionability of Statements

To be actionable, "the statement must be both false and defamatory." Id.

"[D]efamatory words that are actionable per se" include "those which impute to a person the

commission of some criminal offense involving moral turpitude, for which the party, if the

charge is true, may be indicted and punished" and "those which prejudice such person in his

or her profession or trade." Tronfeld v. Nationwide Mut. Ins. Co., 272 Va. 709, 713, 636

S.E.2d 447, 449–50 (2006) (citing Fleming v. Moore, 221 Va. 884, 889, 275 S.E.2d 632, 635

(1981)).

"Whether an alleged defamatory statement is one of fact or opinion is a question of

law and is, therefore, properly decided by the court instead of a jury." Tronfeld, 272 Va. at

714, 636 S.E.2d at 450 (citing Fuste v. Riverside Healthcare Ass'n, 265 Va. 127, 132–33, 575

S.E.2d 858, 861 (2003)). "In determining whether a statement is one of fact or opinion, a court

may not isolate one portion of the statement at issue from another portion of the statement."

Hyland v. Raytheon Tech. Servs. Co., 277 Va. 40, 48, 670 S.E.2d 746, 751 (2009). Instead, "a

court must consider the statement as a whole." Id. As "defamatory statements may be made

by implication, inference, or insinuation[,]" "the factual portions of an allegedly defamatory

statement may not be evaluated for truth or falsity in isolation, but must be considered in view

of any accompanying opinion and other stated facts." Id.; see also Schaecher v. Bouffault, 290

Va. 83, 101, 772 S.E.2d 589, 599 (2015) (holding that "[a]s with all evaluations of defamatory

statements, however, context is of the utmost importance"); Yeagle v. Collegiate Times, 255 Va. 293, 297–98, 497 S.E.2d 136, 138 (1998) (upholding dismissal of claim after "considering the phrase at issue in the context of the entire article"). Because this context is critical, the court considers the full text of the Termination Memo authored by Corbin, ECF No. 41-1, and the IA report authored by Benson, ECF No. 41-2, integral to the complaint. See Goines, 822 F.3d at 166.

While it is well-established that expressions of opinion are generally protected by the First Amendment, determining whether a given statement is opinion or fact "presents oftentimes nettlesome problems . . . as the evanescent distinction may be hazy at times." Carto v. Buckley, 649 F. Supp. 502, 506 (S.D.N.Y. 1986). In Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990), the Supreme Court indicated that the First Amendment protects statements that are not "provable as false," meaning the language cannot be proved true or false by a "core of objective evidence" or by reference to an "objectively verifiable event." Id. at 21–22. In other words, a statement is not actionable unless it asserts a demonstrably false fact "subject to objective verification." Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 184 (4th Cir. 1998).

In determining whether a statement can be reasonably interpreted as declaring or implying a falsehood or containing a "provably false connotation," the Fourth Circuit has adopted the "thoughtfully elaborated" four-factor test from Ollman v. Evans, 750 F.2d 970 (D.C. Cir 1984), cert. denied, 471 U.S. 1127 (1985). See Potomac Valve & Fitting Inc. v. Crawford Fitting Co., 829 F.2d 1280, 1288–89 (4th Cir. 1987). These factors include: (1) the author or speaker's choice of words; (2) whether the challenged statement is capable of being objectively characterized as true or false; (3) the context of the challenged statement within

the writing or speech as a whole; and (4) the broader social context into which the statement fits.[1] See Hanks v. WAVY Broad., LLC, No. 2:11CV439, 2012 WL 405065, at *9 (E.D. Va. Feb. 8, 2012) (citations omitted). The second factor is a minimum threshold issue that all plaintiffs must meet to sustain a cause of action: if words cannot be described as true or false, they are not actionable. Id. (citing Potomac Valve, 829 F.2d at 1287–88); see also Biospherics, 151 F.3d at 184 (recognizing that Milkovich, like Potomac Valve, placed "primary emphasis . . . on verifiability of the statement").

Applying this legal framework, the court will assess the alleged defamatory statements.

### i. Punch/Kick Statements

Corbin Statements 1–2 and Benson Statements 1–2, 4–6 state that Saville punched and kicked the arrestee in the September 16 incident. But Saville admits that she struck the arrestee with her arm and kicked her. As such, the alleged statements are not defamatory. "A statement 'is not considered false' and thus actionable 'unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" Biospherics, 151 F.3d at 185 (quoting Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517 (1991)). Saville's own pleaded facts admit the "substance, the gist, the sting" of the statements in the Corbin and Benson reports of the incident. As such, these statements cannot support a claim for defamation. Jordan, 269 Va. at 576, 612 S.E.2d at 207, 210. Saville repeatedly admits to using

---

[1] Though not explicitly endorsed in Milkovich, this four-factor test provides a framework for conducting essentially the same analysis using nearly identical indicia to distinguish between opinion and fact. See Milkovich, 497 U.S. at 24 (J., Brennan, dissenting). Indeed, the Fourth Circuit, although noting that Milkovich declined to explicitly adopt the Ollman framework, appears to approve the use by lower courts of its four-factor test in framing their analyses. See, e.g., PBM Prod., LLC v. Mead Johnson Nutrition Co., 678 F. Supp. 2d 390, 401 (E.D. Va. 2009), aff'd sub nom. PBM Prod., LLC v. Mead Johnson & Co., 639 F.3d 111 (4th Cir. 2011).

arm strikes on a restrained individual during the September 16, 2020, incident – the court perceives no salient distinction for the purposes of a defamation claim between the use of "arm strikes" and "punches" to describe Saville's actions. Likewise, because Saville admits to kicking the restrained individual's <u>foot</u>, she cannot successfully allege defamation based on Corbin and Benson's statement that she kicked the individual's <u>ankle</u>. In short, Saville's admissions that she struck and kicked the arrestee in the September 16 Incident preclude any claim that Corbin and Benson's reports that Saville punched and kicked the arrestee were defamatory.[2]

### ii. Concealment/Failure to Report Statements

Corbin Statements 3–4, mentioning concealment and failure to report, when read in the full context of the Termination Memo, are statements of subjective belief based on disclosed facts.[3] The relevant portion of the Termination Memo states the following:

> Additionally, once this incident was over you intentionally engaged in activity to conceal the nature of the incident. As a 17-year veteran of corrections, to include four years as a defensive tactics instructor and a member of the Special Operations Training Team, you are well aware of what qualifies as a "Use of Force" report. Yet you entered the report as an "Informational Report". You admitted in your interview that you are aware that all Use of Force reports are reviewed by the facility investigator and the captain of security. You intentionally omitted the punches from your report. You failed to have a supervisor review

---

[2] It is worth noting that Benson Statement's 1–3 are questions Benson posed during the course of an internal affairs investigation. See <u>Chapin v. Knight-Ridder, Inc.</u>, 993 F.2d 1087, 1094 (4th Cir. 1993) ("A question can conceivably be defamatory, though it must be reasonably read as an assertion of a false fact; inquiry itself, however embarrassing or unpleasant to its subject, is not accusation. The language used cannot be tortured to 'make that certain which is in fact uncertain.'") (quoting <u>Carwile v. Richmond Newspapers, Inc.</u>, 196 Va. 1, 8, 82 S.E.2d 588, 592 (1954)). These statements "cannot reasonably [be] interpreted as stating actual facts," as the "general tenor" negates the impression that actual facts are being asserted. <u>Milkovich</u>, 497 U.S. at 20–21 (citing <u>Hustler Magazine, Inc. v. Falwell</u>, 485 U.S. 46, 50 (1988)).

[3] Corbin's alleged statements were: (3) "[Y]ou intentionally engaged in activity to conceal the nature of the incident" and (4) "You also failed to report this incident to your immediate supervisor per policy."

the report as per policy. Aside from your captain, there were three other captains, several lieutenants and sergeants on duty who could have signed off on the report.

You also failed to report this incident to your immediate supervisor per policy. Towards the end of your interview, you stated that Captain Custer was gone for the day. However, Captain Custer was here on this date until approximately 1840 hours. You failed to report it to him on any of the days following this incident.

General Order #3 states that if an incident rises to the level of criminal in nature the superintendent may obtain a warrant, refer the matter to the appropriate law enforcement agency and/or refer to the Commonwealth Attorney. An investigator for the Frederick County Sheriffs Department was provided the video of the incident, your initial OMS report and Deputy Allday's report. Deputy Allday, from the Winchester City Sheriffs Office, was present during the incident as she was one of the transporting officers of the arrestee/inmate. The investigator for the Sheriff's Department indicated that he believed your actions were criminal in nature meeting the criteria for Assault and Battery. The Commonwealth's Attorney agreed that your actions rose to the level of a crime, but stated that no charges could be brought forth as the statute of limitations had expired. The Commonwealth's Attorney stated that their office would have prosecuted the case if the statute of limitations had not expired.

NRADC's General Orders, the Department of Criminal Justice Services for the Commonwealth of Virginia and recent legislation is very clear on the outcomes of these types of offenses. Had you properly reported the incident over two years ago it would have been investigated at that time. You would have most likely been charged and prosecuted for Assault and Battery. A correctional officer is a position of trust. We take an oath to protect those in our charge. Your actions represent a gross violation of this trust and our oath. As a result of your actions, I intend to terminate your employment with NRADC.

ECF No. 41-1, at 4–5. Given this context, the "bases for the . . . conclusion are fully disclosed"

and "no reasonable reader would consider the [statement] [as] anything but the opinion of the

author drawn from the circumstances related." Chapin, 993 F.2d at 1093.

### iii. Statements that Saville's Conduct Could Be Charged and Prosecuted and Represented a Gross Violation of Her Trust and Oath

The holding in <u>Chapin</u> is equally applicable to this category of statements. <u>Id.</u> Plainly, these statements reflect Corbin's subjective evaluation and opinion as to Saville's conduct. They are not defamatory. <u>See</u> <u>Biospherics</u>, 151 F.3d at 185 (holding that an article stating that "[i]nvestors will sour on Biospherics when they realize that Sugaree isn't up to the company's claims" was not defamatory because "the article clearly disclosed the factual bases for its view"); <u>see also</u> <u>Standing Comm. on Discipline v. Yagman</u>, 55 F.3d 1430, 1439 (9th Cir. 1995) ("A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning."); <u>Phantom Touring, Inc. v. Affiliated Publications</u>, 953 F.2d 724, 730–31 (1st Cir. 1992) (holding that when a statement provides the factual basis underlying its conclusion, it is a "personal conclusion" rather than a statement of fact vulnerable to a defamation claim).

### iv. Statements Made to the Department of Homeland Security

Finally, Saville fails to state a defamation claim based on her general allegation that the defendants told Homeland Security that she had engaged in dishonest conduct. <u>See</u> <u>Phillips v. Lynchburg Fire Dep't</u>, No. 6:16-CV-00063, 2017 WL 2424715, at *9 (W.D. Va. June 5, 2017) (dismissing claim because "defamation under Virginia law requires proof of the exact defamatory words").

### 2.      Qualified Privilege

In any event, the court finds that Corbin's and Benson's statements are protected by a qualified privilege. Qualified privilege insulates from defamation actions communications "on a subject matter in which the person communicating has an interest, or owes a duty, legal,

moral, or social, is qualifiedly privileged if made to a person having a corresponding interest or duty." Great Coastal Exp., Inc. v. Ellington, 230 Va. 142, 153, 334 S.E.2d 846, 853 (1985), overruled by Cashion v. Smith, 286 Va. 327, 749 S.E.2d 526 (2013) (holding that good faith was not a factor in determining whether statements were entitled to qualified privilege). The purpose of qualified privilege is to "encourage open communications on matters of employment while not shielding the use of such communications for an individual's personal malicious purposes." Larimore v. Blaylock, 259 Va. 568, 575, 528 S.E.2d 119, 123 (2000). Deciding whether qualified privilege attaches is a matter of law. Cashion, 286 Va. at 337–39, 749 S.E.2d at 532–33.

Saville states that Corbin published the Actionable Statement in two ways: by publishing the Termination Memo "for jail staff to see" and by republishing the "exact written statement[ ] throughout the grievance process." SAC, ECF No. 38, at ¶¶ 12–13. The first alleged publication method does not meet the publication requirement, as Saville does not plead that the Actionable Statement was seen by any non-privileged jail staff. See Katz v. Odin, Feldman & Pittleman, P.C., 332 F. Supp. 2d 909, 916 (E.D. Va. 2004); Thalhimer Bros. v. Shaw, 156 Va. 863, 872, 159 S.E. 87, 91 (1931) ("Publication sufficient to sustain common-law defamation is uttering the slanderous words to some third person so as to be heard and understood by such person.") (emphasis added). The second method of publication—to those involved in the grievance process—involves communication between individuals with corresponding interests or duties and is therefore subject to qualified privilege. See Larimore, 259 Va. at 573, 528 S.E.2d at 121 ("We have applied the doctrine of qualified privilege in a number of cases involving defamatory statements made between co-employees and employers

in the course of employee disciplinary or discharge matters.") (collecting cases). Given the internal investigation context of Corbin and Benson's statements, the court finds that they are subject to a qualified privilege.[4]

### IV. Conclusion

For the foregoing reasons, the defendants' Motion to Dismiss is **DENIED** as to Title VII against the NRJA (Count One), **GRANTED** as to the VHRA as to all defendants (Count Two), and **GRANTED** as to the defamation claim as to all defendants (Count Six).

It is **SO ORDERED**.

Entered: January 8, 2024

Michael F. Urbanski
Chief U.S. District Judge
2024.01.08 10:10:47
-05'00'

Michael F. Urbanski
Chief United States District Judge

---

[4] Although qualified privilege may be lost where, for example, there is common law malice or abuse of privilege, Cashion, 286 Va. at 338–39, 749 S.E.2d at 532–33, plaintiff has not pled facts sufficient to defeat the privilege "by clear and convincing evidence." Id., 286 Va. at 338, 749 S.E.2d at 532. Should discovery reveal a factual basis for the loss of this privilege, Saville may seek leave to amend her complaint.