CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

June 10, 2024
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | |
|---|---|
| JACQUALINE SAVILLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 5:22-cv-057 |
| | ) |
| v. | ) By:   Michael F. Urbanski |
| | ) Chief United States District Judge |
| NORTHWESTERN REGIONAL | ) |
| JAIL AUTHORITY, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This matter comes before the court on a motion for summary judgment, ECF No. 61, filed by defendant Northwest Regional Jail Authority ("NRJA").[1] Plaintiff Jacqualine Saville alleges that she suffered a variety of adverse employment actions because of her sex and in retaliation for her opposition to sex discrimination. See Third Am. Compl., ECF No. 52, ¶ 1.[2] She brings claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17; the Virginia Human Rights Act ("VHRA"), Va. Code Ann. §§ 2.2-3900–2.2-3909; and the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206.[3] Specifically, Saville brings the following claims: Sex discrimination in violation of Title VII (Count One); sex

---

[1] Plaintiff Jacqualine Saville originally brought this lawsuit against the Northwestern Regional Adult Detention Center ("NRADC"), the incorrect legal entity. See Compl., ECF No. 1, ¶ 1. The court granted Saville leave to amend to name the correct defendant, see Order, ECF No. 14, at 1, and Saville subsequently filed a First Amended Complaint against NRJA; Clay Corbin in his individual capacity and in his capacity as Superintendent of NRADC; and Kim Benson in her individual capacity and in her capacity as Sergeant and NRADC Investigator, see First Am. Compl., ECF No. 18, ¶ 1. With leave of court, Saville has twice again amended her complaint against these defendants. See Second Am. Compl., ECF No. 38; Third Am. Compl., ECF No. 52.

[2] Saville's Third Amended Complaint is improperly captioned "Second Amended Complaint." ECF No. 52, at 1. Saville filed her original complaint, ECF No. 1, and has amended three times. Accordingly, the court will refer to the operative complaint as the Third Amended Complaint.

[3] The court previously dismissed Saville's claim for defamation under Virginia law. See Order, ECF No. 60, at 2.

discrimination in violation of the VHRA (Count Two); retaliation for opposing sex discrimination under Title VII (Count Three); pay discrimination in violation of the EPA (Count Four); and retaliation in violation of the EPA (Count Five).[4] See Third Am. Compl., ECF No. 52, ¶¶ 151–198. For the reasons stated below, the motion is **GRANTED in part** and **DENIED in part**. The Court **GRANTS** the motion as to Counts Four and Five and **DENIES** the motion as to Counts One, Two, and Three.

## I. Background

Saville points to several incidents throughout her tenure as an officer at the NRADC as evidence of sex discrimination and retaliation. To fully recount these instances, the court first surveys the NRADC's employment structure and Saville's rank history.

The NRADC is a jail located in Winchester, Virginia, operated by the NRJA. Saville worked at the NRADC from July 2008 until she was discharged on November 29, 2022. Saville Dep., ECF No. 62-1, 24:12–14. The NRADC organized its employees into the following seven ranks of officers, from lowest to highest: Correctional Officer I, Correctional Officer II, Correctional Officer III, Sergeant, Lieutenant, Captain, and Superintendent. See Corbin Decl., ECF No. 62-2, ¶ 4. As an employee progresses up the ranks, her salary increases accordingly. Id. ¶¶ 32–33. An employee may have the opportunity to skip ranks, proceeding, for example, from Correctional Officer I directly to Sergeant. Id. Notably, when an officer skips a rank, she

---

[4] At the outset, the court notes that, at this stage, Saville proceeds only against NRJA, not against Clay Corbin or Kim Benson. Prior to the court's January 8, 2024, ruling on defendants' motion to dismiss, Corbin and Benson faced claims under the VHRA and for defamation under Virginia law. However, the court dismissed those claims against Corbin and Benson, and Saville has not re-alleged any further claims against those defendants. See Order, ECF No. 60. Accordingly, the Third Amended Complaint is **DISMISSED** against Corbin and Benson in their individual and official capacities. NRJA remains as the only defendant.

does not receive the pay increase associated with the skipped rank, and her resulting salary is slightly lower than the salary of an officer of equivalent rank who did not skip a rank. Id. ¶ 33.

Saville started at the rank of Correctional Officer I in July 2008, and skipped the ranks of Correctional Officer II and Correctional Officer III before she became a Sergeant in 2013 and then a Lieutenant in 2017. Saville Dep., ECF No. 62-1, 39:6–40:11. Saville received pay increases commensurate with these promotions, accounting for the fact that she skipped two ranks during her progression. Another Lieutenant, Mike Parker, also skipped ranks and received lower pay than his fellow male lieutenants who did not skip ranks. See Corbin Decl., ECF NO. 62-2, ¶ 35.[5] Saville received positive performance reviews in June 2018, June 2019, and May 2020. See Performance Reviews, ECF Nos. 62-5 (2018), 70-3 (2019), 70-4 (2020).

Saville claims that, as an employee at the NRADC, she suffered disparate treatment because she is a woman. Saville was twice discharged, first in 2020 and again in 2022. Her first termination occurred after an internal investigation into a verbal altercation she had with a subordinate officer on September 21, 2020, revealed that Saville had not been candid with the investigator. Saville challenged the jail's decision, and a grievance board overturned her termination and reinstated her. Saville claims that she experienced repeated instances of sex discrimination and retaliation after she was reinstated, which caused her to file this lawsuit in October 2022 while she was still employed by NRJA. Six weeks after Saville served the defendants in this case, she was terminated again, ostensibly for use of excessive force, and

---

[5] Saville submitted her own unsigned declaration in opposition to the motion for summary judgment. Generally, the court may not consider unsigned declarations. See Savage v. Fed. Home Loan Mortg. Corp., No. 19-2482, 2021 WL 5330345, at *7 (D. Md. Nov. 16, 2021) (declining to consider unsigned expert reports). Moreover, the content of Saville's unsigned declaration, if considered, would not change the court's decision on the motion. See id. (noting that the content of the unsigned expert reports would not change the outcome). Accordingly, the court will not consider Saville's unsigned declaration.

for concealing the use of such force from her supervisors, during a September 16, 2020, altercation with a restrained inmate. Jail personnel claim they first learned of the incident on October 19, 2022, two days after Saville served the jail with the Complaint in this case. The court will review the evidence of these altercations and other instances of alleged discrimination.

### A. September 21 Incident and First Termination

On September 21, 2020, Saville engaged in a verbal altercation with her subordinate, Officer Cody Landis, a correctional officer two to three ranks below Saville.[6] On October 5, 2020, Captain Heath Custer, Saville's direct superior, issued Saville a reprimand and a one-day suspension without pay for her conduct during the incident. For her part, Saville did not discipline Landis even though he had engaged in an argument with his superior. See Saville Dep., ECF No. 62-1, 66:21–67:9.

Saville appealed this discipline, and jail personnel opened an internal affairs investigation to review Custer's report and Saville's punishment. See id. at 76:11–20. On October 22, 2020, Captain Shawn McQuaid issued a report on the internal affairs investigation in which he reviewed various written statements about the altercation between Saville and Landis, recounted interviews McQuaid conducted with a number of witnesses to the

---

[6] The record contains scant details about the content of this altercation. The parties reference Captain Heath Custer's level one reprimand report, see ECF No. 62-2, at 8–9, as well as the subsequent internal affairs investigation report written by Captain Shawn McQuaid, ECF No. 62-2, at 10–30. However, the court cannot consider these reports as evidence of Saville's conduct during the altercation because neither Custer nor McQuaid had personal knowledge of the incident. Additionally, Saville references a draft of her report, ECF No. 70-22, and Landis' report, ECF No. 70-21, on the incident, however these reports constitute hearsay and cannot be considered for the truth of the matters asserted therein. Regardless, the content of the altercation is not relevant to this motion. Accordingly, the court finds only that an incident occurred between Saville and Landis on September 21, 2020.

altercation, and discussed the content of surveillance video that captured the incident.[7] See ECF No. 62-2, at 10–30. McQuaid concluded that the witnesses consistently recalled the altercation and found no basis to overturn the reprimand and suspension Custer had issued to Saville. Id. at 27. Moreover, McQuaid found that Saville had violated the jail's code of ethics by giving misleading statements during his investigation. Id. at 28. Specifically, McQuaid wrote that Saville had denied telling two other officers that she would write Landis up or have him fired if he made a complaint against her. Id. McQuaid made several additional findings that Saville had lied or made misleading statements during the investigation, and recommended that Superintendent James Whitley sustain the reprimand and suspension. Id. at 30.

On November 2, 2020, Whitley sent a memorandum to Saville informing her that he had terminated her employment effective immediately. See ECF No. 62-2, at 31–34. Whitley concurred with McQuaid's conclusions but determined that reprimand and suspension was not sufficient punishment, and that discharge was warranted. Id. at 33–34.

Saville successfully appealed Whitley's termination decision to a grievance board for Frederick County, Virginia employees. The grievance board concluded that the evidence it reviewed did not support termination and ordered that Saville be reinstated. See ECF No. 62-2, at 36. Saville was reinstated and issued back pay. See Corbin Decl., ECF No. 62-2, ¶ 15.

**B. Events Between Terminations and This Lawsuit**

Saville returned to work on March 1, 2021, shortly after the grievance panel ordered reinstatement. See Corbin Dep., 109:3–110:17. She returned not to her former role of

---

[7] While the court will not consider this report for its truth, the court will rely upon it for its effect on Superintendent James Whitley, who reviewed the report in considering Saville's appeal of her reprimand.

Lieutenant of Classification and Security, see Saville Dep., ECF No. 62-1, 79:7–8, but instead to the new role of Director of Staff Development, see Corbin Decl., ECF No. 62-2, ¶ 23. Saville claims that she had more responsibilities than her predecessor in this new role, but Corbin contends that her responsibilities were identical to her predecessor. Id. Later that month, Saville met with Superintendent Clay Corbin to discuss concerns she had about the jail, including that she wanted more women to fill supervisory roles. Id. Corbin told Saville that he could not fill those roles with women until they applied, and that he could only encourage women to do so. Id., 113:18–114:7. He also told Saville that he did not appreciate how her attorney had disparaged the jail and its employees during the grievance panel appeal process. Id., 179:1–180:1. Saville then shared that she did not like that female officers only worked in the female housing units while male officers worked in both female and male housing units, to which Corbin replied that that "people have to work where they have to go," and that "we don't always have the privilege of everybody being able to work in specialty spots." Id., 180:2–21. Saville also told Corbin that she believed she was receiving lower pay than other lieutenants at the jail. Id. at 111:7–13.

Saville had previously raised the issue of her pay with Custer before she was terminated in November 2020. Custer Dep., ECF No. 62-3, 18:1–12. Custer reviewed Saville's pay and, in consultation with Corbin, had successfully petitioned Frederick County to raise her pay. Id. Further, Custer wanted to raise Saville's salary to be commensurate with the other lieutenants even though she had skipped the ranks of Correctional Officer II and Correctional Officer III, career choices that would normally cause her salary to be lower than those of her fellow lieutenants who chose not to skip ranks. Id.

In May 2021, Saville received a slightly lower score on her performance review than she had received in 2020. See 2021 Performance Review, ECF No. 70-5. Custer performed the evaluation and wrote that Saville had "struggled to come to terms with" the reprimand and suspension issued after the September 21, 2020, incident, and explained that her interpersonal relations and work habits had suffered accordingly. Id. However, Custer also noted that "Lt. Saville works harder than most supervisors at her rank," and that "[s]he continues to devote all her efforts to helping the facility in any ways asked of her." Id.

During the remainder of 2021 and into 2022, Saville clashed several times with her supervisors. In June 2021, Saville locked her key to the armory in the armory, which caused Custer to place a reference to the incident in her employment file, an action with which Saville took issue. See Custer Dep., ECF No. 62-3, at 125:1–126:16. Custer himself had previously locked his keys in the armory, for which he also received a reference in his employment file. Id. In August 2021, Custer informed Saville that she had arrived late to work nine times since March 2021 and that she needed to correct this tardiness. See ECF No. 62-2, at 39. Corbin later offered to modify Saville's work hours to accommodate a later start time, but Saville never agreed to change her schedule. Corbin Decl., ECF No. 62-2, ¶ 20–21. In January 2022, Saville spoke with Corbin about having to change her parking location, and Corbin explained that the jail had modified its parking allotment such that she and other staff members could no longer park in a certain spot. Corbin Decl., ECF No. 62-2, ¶ 22. Corbin informed Saville that he had already told several male employees that they were no longer allowed to park in the spot at issue. Id. Finally, Saville took issue with the jail's limitation on weekly overtime pay, and Custer had a conversation with Saville about her opportunity to work overtime. Custer

7

Dep., ECF No. 62-3, 12711–128:22.[8] At no point did the jail open an internal investigation into any of Saville's concerns.

Saville filed this lawsuit on October 4, 2022, to recover "for paying her less than her male comparators, for disparately disciplining her on the basis of her sex, and for retaliating against her for her protected activity," while she remained employed at the NRADC. Initial Compl., ECF No. 1, ¶ 1. Saville served former defendant NRADC on October 17, 2022.

### C. September 16, 2020, Incident and Second Termination

NRJA informed Saville that she would be discharged for a second time on November 29, 2022, less than two months after she served her Complaint in this case. See ECF No. 70-37. Corbin explained in the termination letter that on October 19, 2022, two days after Saville had served her complaint, Custer had become aware of surveillance video showing Saville punching a restrained pretrial detainee on September 16, 2020. Id. at 1. Corbin stated that "the video had never been reviewed by command staff prior to October 19, 2022," and that the content of the video required that Saville's employment be terminated. Id.

Accounts of the September 16, 2020, incident vary, and the parties did not provide the court with the surveillance video.[9] Regardless, some of Saville's fellow officers and multiple inmates either witnessed the altercation as it occurred or learned about it shortly thereafter. See Stewart Dep., ECF No. 70-6, 15:2–16:17; DeRito Dep., ECF No. 70-9, 22:4–24:22 (stating that he used his personal cell phone to record a jail monitor screen displaying the surveillance

---

[8] NRJA cites to page 129 of Custer's deposition as evidence of the specific content of this conversation, see Mem. Supp., ECF No. 62, at 6, however the parties did not include this page in the excerpts of Custer's deposition provided to the court.
[9] Saville claims that surveillance videos recorded by the two cameras in the room where the altercation occurred were deleted and that the only remaining video does not clearly show the incident because the camera was located in another room and had a narrow view into the relevant area. See Mem. Opp., ECF No. 70, at 3.

video of the September 16, 2020, altercation); ECF No. 70-10 (Facebook messages between Officer Joshua Brown and Lieutenant John DeRito regarding the surveillance video of the September 16, 2020, altercation). Moreover, later that same day, Saville and Landis, who witnessed the altercation, completed reports that detailed the incident, including Saville's use of force against the detainee. Corbin Dep., ECF No. 70-11, 70:13–71:13. Saville and Landis' reports were automatically emailed to all supervisory employees at the jail that same day, including Corbin and Custer, and while these two supervisors acknowledge that they received these automatic emails on September 16, 2020, they claim that they did not review Saville or Landis' reports until October 19, 2022, two days after Saville served her Complaint in this case on the jail. See id., 68:11–14; Custer Dep., ECF No. 70-19, 58:19–61:20. Custer and Corbin each contend that they did not review the reports because Saville classified her report as informational, not as use-of-force. Id.

NRJA claims that Custer, Corbin, and other supervisory officers learned of the September 16, 2020, incident as a result of a meeting between Lieutenant John DeRito, Lieutenant Mackey[10] and Custer on October 19, 2022, two days after the jail was served with Saville's Initial Complaint in this case. Custer and DeRito recall the meeting in different ways. For his part, Custer claims that he informed DeRito and Mackey that "staff need to act in a professional manner and Supervisors needed to address any allegations of harassment," at which point DeRito showed Custer the video of Saville and the detainee. See ECF No. 70-27, at 1. DeRito testified in his deposition that he and Custer were discussing "disciplinary actions

---

[10] The parties do not include Mackey's first name.

and how they were handed down," at which point DeRito showed Custer the video of the September 16, 2020, incident. See DeRito Dep., ECF No. 70-9, 30:6–33:7.

Custer informed Corbin about the September 16, 2020, video, and on October 21, 2022, Corbin asked NRADC Investigator Kim Benson to determine whether an internal investigation was warranted. See ECF No. 70-27, at 2. On October 24, 2022, Benson decided to conduct an internal investigation, id. at 3, which eventually caused Corbin to terminate Saville's employment, see ECF No. 70-37. Additionally, Corbin referred the matter for investigation by the Frederick County Sheriff's Office, which concluded that Saville's "actions rose to the level of a crime, but . . . that no charges could be brought forth as the statute of limitations had expired." Id. at 4. After she was discharged, Saville amended her Complaint in this case to add allegations related to her discharge.

### D. Other Use of Force Incidents

Corbin recalls two incidents that occurred after the September 16, 2020, incident where officers used force against inmates. Saville was not involved in either incident. First, on April 7, 2021, an inmate became combative as several officers transported him for a medical assessment. See Corbin Dep., ECF No. 70-11, 120:16–122:22. The inmate was handcuffed to a chair before he was closed-fist punched and pepper sprayed. Id. Corbin, who was responsible for supervising the officers involved, acknowledged that the officer who closed-fist punched the inmate "did not have the right to strike at" certain areas of the inmate's body, but nonetheless punched the inmate in those areas. Id. Additionally, Corbin explained that although the inmate was handcuffed to a wheelchair, the officers "still didn't have him in compliance," and that "the situation [was] not done" until after the officer closed-fist punched

10

the restrained inmate. Id. Corbin testified that he originally issued the officer a level two reprimand but reduced the punishment to a level one reprimand "upon reading [the officer's] appeal." Id.

On December 4, 2022,[11] an inmate refused to return to his cell from the shower. Id., 118:1–120:15. Several officers used pepper spray and twice tasered the inmate because "they need[ed] to get him out of the shower and get him into a restraint chair or get him back into his cell." Id. No officers received discipline for this incident. Id.

## II. Legal Standard

Under Rule 56, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward

---

[11] There was some discrepancy as to whether this event occurred in 2022 or 2020, but the parties clarified that the altercation occurred in 2022. See Corbin Dep., ECF No. 70-11, 120:10–13.

and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Anderson, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

12

### III.    Discussion

Saville brings five claims against NRJA: sex discrimination in violation of Title VII (Count One); sex discrimination in violation of the VHRA (Count Two); retaliation in violation of Title VII (Count Three); pay discrimination in violation of the EPA (Count Four); and retaliation in violation of the EPA (Count Five). Third Am. Compl., ECF No. 52, ¶¶ 151–198. The court will address each of Saville's claims in turn, beginning with her sex discrimination claims under Title VII and the VHRA.

### A. Counts One and Two: Sex Discrimination in Violation of Title VII and the VHRA

The court will analyze Saville's sex discrimination claims under Title VII and the VHRA together because the two claims rest on the same allegations and the statutes "use substantially similar language" to prohibit discrimination. Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc., 677 F. Supp. 3d 383, 394 n.4 (W.D. Va. 2023); see also Sunkins v. Hampton Rds. Connector Partners, No. 2:23-cv-91, 2023 WL 7411761, at *3 (E.D. Va. Nov. 9, 2023) ("Plaintiff's Title VII and VHRA discrimination claims are based on the same facts and the statutes are substantially the same, so the court analyzes these claims together." (citing Abreu v. N. Am. Partners in Anesthesia, LLP, No. 1:22-cv-759, 2023 WL 5959430, at *10 n.8 (E.D. Va. Sept. 12, 2023))). In Count One, Saville claims that NRJA discriminated against her because of her sex by paying her less than the male lieutenants at the jail and by more severely disciplining her than her male colleagues. See Third Am. Compl., ECF No. 52, ¶ 156. Through Count Two, Saville seeks to recover under the VHRA for the same conduct. See id. ¶ 168.

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII and the VHRA require a plaintiff to show intentional discrimination, which she may do by "proceed[ing] under the mixed-motive framework or the McDonnell Douglas burden-shifting framework." Sempowich v. Tactile Sys. Tech., Inc., 19 F.4th 643, 649 (4th Cir. 2021) (first citing Perkins v. Int'l Paper Co., 936 F.3d 196, 206 n.4 (4th Cir. 2019), and then citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Here, Saville proceeds only under the burden-shifting framework, which requires that she put forward evidence "to develop an inferential case of discriminatory intent." Spencer v. Va. State Univ., 919 F.3d 199, 207 (4th Cir. 2019); Washington, 677 F. Supp. 3d at 396 ("The McDonnell Douglas framework applies to discrimination claims brought under Title VII . . . and the VHRA." (citing Laird v. Fairfax Cnty., 978 F.3d 887, 892 n.4 (4th Cir. 2020))).

Saville bases her disparate treatment claims under Title VII and the VHRA on two categories of alleged discrimination: pay-based disparate treatment and non-pay-based disparate treatment. As the tests for these two categories of discrimination differ slightly, the court will address them separately.

### 1. Non-Pay-Based Disparate Treatment

Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of discriminatory intent. Sempowich, 19 F.4th at 649 (citing Lettieri v. Equant, 478 F.3d 640, 646 (4th Cir. 2007)). "To establish a prima facie case of disparate treatment, a plaintiff must prove four elements: '(1) membership in a protected class; (2) satisfactory job

14

performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" Cosby v. S.C. Probation, Parole & Pardon Servs., 93 F.4th 707, 714 (4th Cir. 2024) (quoting Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010)). If the plaintiff meets her burden, then the employer must put forward evidence of "a nondiscriminatory explanation for its actions." Sempowich, 19 F.4th at 650 (citing Lettieri, 478 F.3d at 646). If the employer successfully does so, "the burden then shifts back to the plaintiff to show that the employer's explanation was 'actually a pretext for discrimination.'" Id. (citing Lettieri, 478 F.3d at 646).

### i.  Saville's Prima Facie Case

NRJA does not contest the first two elements of Saville's prima facie case. Instead, NRJA claims that the conduct Saville references in support of her claim does not constitute adverse employment action. Additionally, NRJA argues that Saville has not shown that she was treated differently than similarly situated employees who were not women with respect to these allegedly adverse employment actions. The court will first determine which, if any, of Saville's asserted adverse employment actions are supported by the evidence. Then the court will examine whether the evidence shows that, in the context of any surviving adverse employment actions, Saville was treated differently than her male colleagues.

### a.  Adverse Employment Actions

"For a discrimination claim, the plaintiff must show that her employer took an action that adversely 'affect[ed] employment or alter[ed] the conditions of the workplace.'" Laird, 978 F.3d at 893 (emphasis in original) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006)). "[T]he adverse action must result in 'some significant detrimental effect,'

as requiring more than a position that is 'less appealing' to the plaintiff." Id. (emphasis in original) (quoting Holland v. Wash. Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007)). Of course, whether certain conduct qualifies as an adverse employment action "depends on the particular circumstances of the case," id., and the court will review each of Saville's asserted actions to determine whether they "result[] in some 'significant detriment' to the employee." Id. (first quoting Adams v. Anne Arundel Cty. Pub. Schs., 789 F.3d 422, 431 (4th Cir. 2015); and then citing Holland, 487 F.3d at 219).

Saville contends that she experienced numerous adverse employment actions during her employment at the NRADC. The court's review of the record reveals 10 non-pay-related events that Saville contends are adverse employment actions. Namely, Saville points to (1) the reprimand and suspension she received after her September 21, 2020, interaction with Landis; (2) her termination in November 2020; (3) NRJA's failure to remove the reprimand from her record after she was reinstated in March 2021; (4) additional job duties she had as Director of Staff Development compared to those held by her predecessor; (5) the lower performance review she received in 2021 compared to those she received in 2018, 2019, and 2020; (6) the reference in her employment file after she locked her keys to the armory in the armory in June 2021; (7) the August 2021 letter in her employment file after she had arrived late to work nine times; (8) Corbin's refusal to allow her to park in a certain parking spot in January 2022; (9) restrictions on her ability to work overtime; and (10) her second termination in November 2022.

Neither the reprimand nor the one-day suspension following Saville's September 21, 2020, interaction with Landis qualify as adverse employment actions. A reprimand, standing

alone, does not "constitute the sort of adverse employment action cognizable under Title VII unless [the] plaintiff also alleges that the reprimand has potential collateral consequences that rise to the level of an adverse employment action." Smith v. Va. Hous. Dev. Auth., 437 F. Supp. 3d 486, 510 (E.D. Va. 2020) (citing Hinton v. Va. Union Univ., 185 F. Supp. 3d 807, 819 (E.D. Va. 2016)). Though Saville also received a one-day suspension without pay with the reprimand, Corbin reversed the suspension without pay upon Saville's reinstatement in March 2021. Corbin Decl., ECF No. 62-2, ¶ 16; see Dennis v. Cnty. of Fairfax, 55 F.3d 151, 156 ("Where an employer has taken prompt and effective corrective measures to redress alleged incidents of . . . harassment, the employer is not liable because its final act was not of a discriminatory nature."); see also Witherspoon v. Brennan, 449 F. Supp. 3d 491, 501 (D. Md. 2020) ("[W]hen an employer remedies an initial adverse action with 'final and corrective' measures, the adverse action itself 'cannot be used as evidence that discrimination existed.'" (quoting Lurie v. Meserve, 214 F. Supp. 2d 546, 550 (D. Md. 2002))). Moreover, NRJA's failure to remove the reprimand from Saville's employment record after her reinstatement in March 2021 does not qualify as adverse employment action because the reprimand itself had no meaningful affect on her employment at the jail. See Smith, 437 F. Supp. 3d at 510.

The same rationale applies to Saville's November 2020 termination. The Frederick County grievance panel reversed NRJA's decision to terminate Saville, and she received back pay upon her return to the jail in March 2021. Corbin Decl., ECF No. 62-2, ¶¶ 15–16. Accordingly, Saville was made whole by NRJA's final action, and no claim for relief lies from the November 2020 termination. See Dennis, 55 F.3d at 156 ("[W]here an employer implements timely and adequate corrective measures after harassing conduct has come to its

attention, vicarious liability should be barred regardless of the specific motivation for the wrongdoing or the particular cause of action.").

Saville's claim that NRJA saddled her with additional job duties does not qualify as adverse employment action for two reasons. First, Saville has presented no evidence as to the specific job duties she was given as Director of Staff Development or as to her predecessor's job duties. Second, "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the previous position." Holland, 487 F.3d at 219 (quoting Boone v. Goldin, 178 F.3d 253, 256–57 (4th Cir. 1999)). Accordingly, Saville's additional job responsibilities as Director of Staff Development do not constitute adverse employment action.

Neither the lower 2021 performance review, reference in her employment file after she locked her keys in the armory, tardiness letter, nor her inability to park in a certain parking spot constitute adverse employment actions. None of these actions "result[ed] in some 'significant detriment'" to Saville, as required to qualify as adverse conduct. Laird, 978 F.3d at 893 (quoting Adams, 789 F.3d at 431). Saville received a total score of 3.6 out of 5 on her 2021 performance review, see ECF No. 70-5, after receiving an identical score of 3.6 in 2018, see ECF No. 62-5 at 4, and 2019, see id. at 3, and after receiving a score of 3.9 in 2020, see id. at 2. For one, Saville's score in 2021 did not meaningfully differ from her 2018, 2019, or 2020 scores. More foundationally, however, the 2021 performance review had no meaningful impact on her employment—she maintained the same job title, duties, and pay. See Peterson

v. Capital One, N.A., No. 22-1759, 2023 WL 8529123, at *5 (D. Md. Dec. 7, 2023) ("Simply receiving a negative performance evaluation . . . is not an adverse action." (citing Pulley v. KPMG Consulting, Inc., 348 F. Supp. 2d 388, 395 (D. Md. 2004))). As to the reference in her employment file after she locked her keys in the armory, Saville presents no evidence that the reference affected her employment in any way. The same is true for the tardiness letter and her inability to park in certain parking spots—there is no indication in the record that these occurrences had any impact on Saville's employment, much less that they resulted in a "significant detriment" to Saville. Laird, 978 F.3d at 893.

Saville's contention that Custer prevented her from working overtime likewise does not qualify as an adverse employment action. There is scant evidence that Saville was precluded from working overtime and no evidence as to the specific amount of overtime Custer barred Saville from working. Indeed, the only evidence on this point is that Saville and Custer each testified that they discussed limiting Saville's overtime hours. See Saville Dep., ECF No. 70-8, 129:2–130:6; Custer Dep., 127:11–128:22. However, Saville also testified that the jail was "short staffed and everybody was working overtime." Saville Dep., ECF No. 70-8, 129:13–18. Without any evidence as to the effect, if any, that this preclusion had on Saville's income, the court cannot conclude that Custer's conversation with Saville about overtime constitutes adverse employment action.[12]

---

[12] In Ray v. International Paper Co., the Fourth Circuit held that an adverse employment action occurred for purposes of a Title VII retaliation claim when a supervisor restricted the number of overtime hours an employee could work. 909 F.3d 661, 670 (4th Cir. 2018). However, the court emphasized that the "standard for establishing an adverse employment action under Title VII's antiretaliation provision is more expansive than the standard for demonstrating a tangible employment action under the statute's antidiscrimination provisions," and rested its conclusion on the factual finding that the employee had "lost a 'significant part of [her] earnings.'" Id. Here, there is no evidence as to the impact that Saville's conversation with Custer about overtime had on her earnings.

Lastly, Saville's termination on November 29, 2022, constitutes adverse employment action. See 42 U.S.C. § 2000e-2(a)(1); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

In sum, the court finds that Saville suffered one non-pay-based adverse employment actions for the purposes of her Title VII disparate treatment claim: she was discharged in November 2022. For the reasons stated above, none of Saville's other alleged adverse employment actions resulted in a "significant detriment" to her. Laird, 978 F.3d at 893.

### b. Differential Treatment

To establish a prima facie case, Saville must put forward evidence that she was discharged in November 2022 while male NRJA employees who engaged in similar conduct received less or no discipline. "The similarly situated element requires a plaintiff to 'provide evidence that the proposed comparators are not just similar in some respects, but 'similarly-situated in all respects.'" Cosby, 93 F.4th at 714 (emphasis in original) (quoting Spencer, 919 F.3d at 207–08).

> To that end, the plaintiff must prove that she and the comparator "dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Haynes v. Waste Connections, Inc., 922 F.3d 219, 223–24 (4th Cir. 2019) (cleaned up). To be sure, "a comparison between similar employees will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." Id. at 223 (cleaned up). Nonetheless, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly

20

established in order to be meaningful." <u>Lightner v. City of Wilmington</u>, 545 F.3d 260, 265 (4th Cir. 2008).

<u>Cosby</u>, 93 F.4th at 714.

Here, NRJA puts forward two reasons for Saville's discharge: she used excessive force against a restrained inmate and concealed the nature of the altercation by categorizing her report as "informational" instead of "use of force." <u>See</u> ECF No. 70-37. Though Saville does not reference them in her briefing, the evidence reveals two use-of-force incidents worthy of comparison on her sex discrimination claim: the April 7, 2021, altercation with a restrained inmate and the December 4, 2022, altercation with an inmate who refused to return to his cell. <u>See</u> Corbin Dep., ECF No. 70-11, 118:1–122:22. Though a correctional officer closed-fist punched a handcuffed inmate on April 7, 2021, the officer received only a level one reprimand—the same discipline Saville received for her verbal altercation with Landis on September 21, 2020. As to the December 4, 2022, altercation, the officers received no discipline.

The court finds that the December 4, 2022, altercation is not sufficiently similar to the September 16, 2020, incident to establish disparate treatment. In the December 4 incident, the inmate refused to return to his cell, so the officers subdued him. In the September 16 incident, Saville closed-fist punched a restrained detainee. Accordingly, the lack of discipline issued to the officers involved in the December 4 incident has no bearing on Saville's discipline in November 2022.

The April 7, 2021, incident, on the other hand, bears significant similarities to the September 16, 2020, incident. During both altercations, the inmates were restrained. Additionally, both correctional officers used closed-fist punches to subdue the inmates. The

officer who administered the punches in the April 7 altercation received only a level one reprimand, while Saville was discharged.

In Wimbley v. Cashion, a female correctional officer was discharged after using pepper spray in an inmate housing area. 588 F.3d 959, 960–61 (8th Cir. 2009). The officer claimed that her termination was motivated in part by sex discrimination and pointed to a male correctional officer who, during the same incident, pepper sprayed an inmate, threw him on the floor, and placed a knee on his neck, but received no discipline. Id. at 961. The Eighth Circuit found that the two correctional officers were similarly situated for the purposes of her disparate treatment claim. Id. at 962. The court reasoned that the officers shared the same supervisor and "were involved in similar pepper-spray conduct but were disciplined in different ways." Id.; see also Baer-Burwell v. City of Peoria, No. 09-cv-1309, 2012 WL 5198342, at *12–13 (C.D. Ill. Oct. 19, 2012) (finding that multiple correctional officers were similarly situated because they received disparate discipline for similar insubordinate conduct).

Here, Saville and the officer involved in the April 7, 2021, altercation share similarities that bring this case within Wimbley's ambit. Both officers were supervised by Corbin and administered closed-fist punches to restrained inmates. However, Saville was discharged while the officer involved in the April 7 incident received only a level one reprimand. It is worth noting that NRJA claims that it terminated Saville because of the excessive force and because she concealed the incident by misclassifying her report. However, a genuine dispute of material fact exists as to whether NRJA was actually motivated by the misclassification because her supervising officers automatically received her report via email when she filed it on September 16, 2020. Additionally, her supervisors received Landis' supplemental report the same day.

Under these facts, a reasonable jury could conclude that NRJA had knowledge of the September 16, 2020, incident when it occurred. Accordingly, the court finds that Saville has established a prima facie case of disparate treatment based on her November 2022 termination.

### ii. Nondiscriminatory Reason and Pretext

NRJA claims that it discharged Saville because she used excessive force and misclassified her report on the September 16, 2020, altercation. "[T]o show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." Sempowich, 19 F.4th at 652 (brackets in original) (quoting Haynes, 922 F.3d at 225).

The evidence gives rise to numerous genuine issues of material fact with respect to NRJA's purported rationale. For one, a jury could reasonably conclude that Saville's supervisors knew about the September 16, 2020, incident long before Custer's October 19, 2022, meeting with DeRito. Moreover, if a jury were to conclude that Saville's supervisors knew about the September 16, 2020, incident when it occurred or shortly thereafter, then the evidence raises another genuine dispute of material fact: whether NRJA discharged Saville because she is a woman in light of the fact that a male officer who engaged in a similar altercation with a restrained inmate on April 7, 2021, received only a reprimand. The evidence does not clearly resolve these questions one way or the other. Accordingly, a jury will decide Saville's claims for non-pay-based disparate treatment under Title VII and the VHRA.

## 2. Pay-Based Disparate Treatment

"A prima facie pay-disparity case under McDonnell Douglas requires a plaintiff to establish (1) she is a member of a protected class, (2) she was performing her job satisfactorily; (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive." Spencer, 919 F.3d at 207. As with the non-pay-based disparate treatment claim, there is no dispute as to the first two elements.

Where "the prima facie case of wage discrimination is based on comparators, the plaintiff must show that she is paid less than men in similar jobs." Id. (citing Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir. 1994)).

> While there is no bright-line rule for what makes two jobs 'similar' under Title VII, courts consider "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided that the employer considered these latter factors in making the personnel decision."

Id. (quoting Bio v. Fed. Express Corp., 424 F.3d 593, 597 (7th Cir. 2005). At base, "the plaintiff must provide evidence that the proposed comparators are not just similar in some respects, but "similarly-situated in all respects.'" Id. at 207–08 (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

Saville points to the male lieutenants at NRJA as comparators, but rank alone is not sufficient to render these employees similar within the meaning of Title VII and the VHRA. Importantly, Saville skipped the ranks of Correctional Officer II and Correctional Officer III while employed at the jail. When an NRJA employee skips a rank, her salary at her promoted position is lower than it would be if she had not skipped a rank. See Custer Dep., ECF No.

62-3, 18:1–20:7; Saville Dep., ECF No. 62-1, 33:1–22 (acknowledging that rank-skipping lowers pay). Saville concedes that none of the male lieutenants, except Lieutenant Parker, skipped ranks during their careers. See Pl.'s Mem. Opp., ECF No. 70, at 14 (admitting that none of the male lieutenants except Lieutenant Parker skipped ranks); Corbin Decl., ECF No. 62-2, ¶ 35. Moreover, Saville acknowledges that Parker's salary was lower than that of the other male lieutenants because he skipped ranks.[13] See Pl.'s Mem. Opp., ECF No. 70, at 14.

The evidence does not support a finding that Saville was paid less than men in similar roles. Saville's proposed comparators do not possess sufficiently similar characteristics to Saville because most of them did not skip ranks in their job progression, and the only proposed comparator who did skip ranks received less pay than the others, just like Saville. Accordingly, Saville has not established a prima facie case of pay-based disparate treatment under Title VII or the VHRA.

## B. Count Three: Retaliation in Violation of Title VII

"Title VII bars retaliation against an employee that has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" Cosby, 93 F.4th at 718 (quoting 42 U.S.C. § 2000e-3(a)). Saville proceeds under the familiar McDonnell Douglas burden-shifting framework, and accordingly must first establish a prima facie case of retaliation. "To establish a prima facie case of retaliation, a plaintiff 'must show (1) that she engaged in protected activity; (2) that her employer took an adverse action against her; and (3) that a causal connection

---

[13] Saville argues in opposition to the motion for summary judgment that, while Parker had a lower salary than the other male lieutenants, his salary was still higher than Saville's salary. See Pl.'s Mem. Opp., ECF No. 70, at 14. However, Saville puts forward no evidence of this pay disparity, and no witnesses testify to its existence.

existed between the adverse activity and the protected action.'" Id. (quoting Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 578 (4th Cir. 2015)).

Saville argues that she "engaged in protected activity when she complained to Benson, Custer, and Corbin about sex discrimination and retaliation." Pl.'s Mem. Opp., ECF No. 70, at 25. At a minimum, Saville engaged in protected activity when she filed a complaint with the Virginia Office of Civil Rights ("VOCR") on July 29, 2021, which was subsequently referred to the Equal Employment Opportunity Commission, see ECF Nos. 62-5, 62-6, and when she served the NRADC with the Initial Complaint in this case on October 17, 2022. See Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 656 (4th Cir. 1998) (filing an EEOC complaint constitutes protected activity); McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991) (same for lawsuit).

Saville meets her burden to show that she experienced one adverse employment action: her November 2022 discharge. See Ellerth, 524 U.S. at 761. The Fourth Circuit has explained that the "standard for establishing an adverse employment action under Title VII's antiretaliation provision is more expansive than the standard for demonstrating a tangible employment action under the statute's antidiscrimination provisions." Ray, 909 F.3d at 670 (citing White, 548 U.S. at 67).

As with her disparate treatment claim, none of Saville's other complaints constitute adverse employment action under Title VII's retaliation provision. The reprimand, suspension, and termination in the fall of 2020 do not qualify as adverse actions because she was reinstated and Custer removed the one-day suspension. Further, NRJA's failure to remove the reprimand from Saville's record after she was reinstated in March 2021 is not an adverse employment

action because there is no evidence that it impacted the terms of Saville's employment. Likewise, there is no evidence that Saville's employment was affected by her additional job duties as Director of Staff Development, the lower 2021 performance review, the reference in her file after she locked her keys in the armory, the tardiness letter, the parking spot issue, or Saville's conversation with Custer about limiting her overtime. Finally, Saville's claim that she was paid less than her male colleagues does not qualify as an adverse employment action because her lower pay arose from her decision to skip the ranks of Correctional Officer II and Correctional Officer III. Like Saville, Lieutenant Parker skipped ranks, and, like Saville, he received lower pay than the other male lieutenants. Accordingly, Saville's retaliation claim may proceed only with regard to her November 2022 termination.

The evidence raises a genuine dispute of material fact as to whether a causal connection existed between Saville's discharge and the protected action. Namely, sufficient evidence exists that a reasonable jury could reach the conclusion that NRJA discharged Saville because she filed this lawsuit. Saville served the jail on October 17, 2022. Two days later, Custer and DeRito met in DeRito's office, at which time DeRito shared the more-than-two-year-old video of the September 16, 2020, altercation between Saville and the restrained detainee. Custer and DeRito recall the meeting differently. Custer claimed that he told DeRito that "staff need to act in a professional manner and Supervisors needed to address any allegations of harassment," at which point DeRito showed Custer the video of Saville and the detainee. See ECF No. 70-27, at 1. DeRito testified in his deposition that he and Custer were discussing "disciplinary actions and how they were handed down," at which point DeRito showed Custer the video, see DeRito Dep., ECF No. 70-9, 30:6–33:7. Additionally, Custer and Corbin claim that they

27

did not know about the video until DeRito shared it on October 19, 2022—two days after Saville served her Initial Complaint on the jail—but Saville and Landis wrote reports about the September 16, 2020, incident the day it occurred, and the reports were automatically and instantly emailed to all jail supervisors, including Custer and Corbin. Indeed, Custer testified that he received emails on September 16, 2020, containing Saville and Landis' reports. See Custer Dep., ECF No. 70-19, 63:8–64:4.

The evidence shows that Saville's November 29, 2022, termination followed directly from the October 19, 2022, discovery of the video of the September 16, 2020, incident. Custer notified Corbin and Benson, and Benson conducted an internal investigation shortly thereafter. On November 25, 2022, Benson concluded her investigation and recommended Saville's termination. Four days later, Corbin discharged Saville.

The two-day proximity between Saville serving the Complaint and DeRito sharing the video with Custer, as well as the differing explanations from Custer and DeRito as to the reason for their meeting and for DeRito sharing the video give rise to a genuine dispute of material fact as to whether a causal connection exists between Saville's protected activity and her termination just six weeks later.

As a legitimate, nondiscriminatory reason for Saville's termination, NRJA argues that Saville miscategorized her report as "informational" and not "use of force." See Custer Dep., ECF No. 70-19, 70:6–17. However, the court cannot endorse this rationale at the summary judgment stage because the evidence raises a genuine dispute of material fact as to whether the explanation is pretextual for the same reasons that Saville meets her burden to establish a causal connection. Namely, Saville and Landis' reports were transmitted to Saville's superiors

on the day of the incident in September 2020. Over two years later, Saville served a copy of this lawsuit on the jail. Two days after that, DeRito shared the video of the September 16, 2020, incident with Custer, who claimed he never had seen it before. This video triggered an internal investigation, which resulted ultimately in Saville's discharge. This evidence gives rise to numerous genuine disputes of material fact. Accordingly, the court will not grant summary judgment to NRJA on Saville's Title VII retaliation claim.

### C. Equal Pay Act Claims

Saville brings two claims under the EPA: pay discrimination and retaliation. See Third Am. Compl., ECF No. 52, ¶¶ 188–198. "To establish a prima facie case of an Equal Pay Act violation, a plaintiff must demonstrate that '(1) the defendant-employer paid different wages to an employee of the opposite sex (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) are all performed under similar working conditions.'" Sempowich, 19 F.4th at 654–55 (quoting EEOC v. Md. Ins. Admin., 879 F.3d 114, 120 (4th Cir. 2018)).

Notably, Saville does not address these claims in opposition to NRJA's motion for summary judgment. See Mem. Opp., ECF No. 70 (containing no discussion of her EPA claims). Additionally, as discussed above, Saville has not identified evidence of comparators sufficient to raise a genuine dispute of material fact as to her disparate-pay claim under Title VII. As the Fourth Circuit has explained, "[e]quality under the [EPA] is a demanding threshold requirement," much more so than the similarity standard required under Title VII. Spencer, 919 F.3d at 203–04, 207. As Saville has not presented comparators under Title VII's less rigorous similarity standard, she has not done so under the EPA. See id. at 204 ("[T]he [EPA's]

inference of discrimination may arise only when the comparator's work is equal to the plaintiff's."). Therefore, Saville has not established a prima facie case under the EPA, and the court will grant summary judgment to NRJA on Counts Four and Five.

## IV. Conclusion

For the reasons stated above, the court **GRANTS** NRJA's motion for summary judgment as to Counts Four and Five, and **DENIES** the motion as to Counts One, Two, and Three. This case remains set for trial to begin July 8, 2024, in Harrisonburg, Virginia.

An appropriate order will be entered.

Entered: June 10, 2024

Michael F. Urbanski
Chief United States District Judge